**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In Re:

LMD HOLDINGS, LLC.                    Case No. 25-47214-prh
                                      Chapter 11
            Debtor.                   Hon. Paul R. Hage
_____/

**COVER SHEET FOR MOTION TO USE CASH**
**COLLATERAL OR TO OBTAIN CREDIT**

The debtor has filed a motion to use cash collateral or to obtain postpetition

financing, which is attached to this Cover Sheet.  In accordance with LBR

4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph

number, the location in the proposed order accompanying the motion of each of the

following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | __X__ Yes<br><br>_____ No | Page 19   6(f); and Page 26, 8(a) |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br> __X__ No | Page ____, ____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _____ Yes<br><br> __X___ No | Page ____, ____ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | __X__ Yes<br><br> _____ No | Page 7,  5; and Page 16,  5(g) |
| (5) Provisions that prime any lien without that lienholder's consent. | _____ Yes<br><br> __X_ No | Page ____, ____ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | __X__ Yes<br><br> _____ No | Page 67,  28(e) |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | __X__ Yes<br><br> _____ No | Page 45,  22 |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br><br> __X__ No | Page ____, ____ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | __X__ Yes<br><br> ___ No | Page 20,  6(g) |

| | | |
|---|---|---|
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>__X___ No | Page ____, _____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>__X___ No | Page ____, _____ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br><br>__X___ No | Page ____, _____ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | _____ Yes<br><br>__X___ No | Page ____, _____ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | __X__ Yes<br><br>_____ No | Page 16,   5(g) |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X___ No | Page ____, _____ |
| (16) Provisions that purport to bind a subsequent trustee. | __X__ Yes<br><br>_____ No | Page 72,   36 |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes<br><br>_____ No | Page 69,   29 |

Respectfully submitted,

Respectfully submitted,

__/s/ Robert Bassel _____
ROBERT N. BASSEL (P48420)
Attorneys for Debtor
P.O. Box T
Clinton, MI 49236
(248) 677-1234
bassel@gmail.com

Dated: November 12, 2025

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re:

LMD HOLDINGS, LLC.          Case No. 25-47214-prh
                              Chapter 11
        Debtor.         Hon. Paul R. Hage

_____/

## MOTION (A) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364; (B) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; (D) MODIFYING THE AUTOMATIC STAY AND (E) SCHEDULING FINAL HEARING

NOW COME Luca Mariano Distillery, LLC (the "Distillery"), and LMD Holdings, LLC (the "Holdings" and collectively with the Distillery, the "Debtors") and file this motion (the "Motion") for immediate entry of an interim order (the "Agreed Interim Order") attached as **Exhibit A** granting the following relief:

(i)      authorization to obtain credit and incur debt pursuant to sections 105, 362, 363 and 364 of the Bankruptcy Code in accordance with the Agreed Interim Order, and the Post-Petition Financing Note (and together with the Agreed Interim Order and Final Order, the "DIP Loan Documents"), between the Debtors and SummitBridge National Investments VIII, LLC ("SummitBridge") (in such capacity, the "DIP Lender"), subject to the terms and conditions set forth herein;

(ii)    authorization to grant first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) and superpriority claims to the DIP Lender, except to the extent provided herein, against all property of the Debtors' (as defined below) estates, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and, except to the extent provided herein, with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(iii)    use "cash collateral" as the term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and, pursuant to sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to SummitBridge, Farm Credit Leasing Services Corporation ("FCLSC"), and Farm Credit Mid-America;

(iv)    modification of the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to implement and perform the terms and provisions of the DIP Financing Documents and the Agreed Interim Order; and

(v)    scheduling a final hearing.

The facts and circumstances supporting this Motion are set forth below and attested to by the Declaration of David M. Baker (the "Baker Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4.      Distillery and Holdings have each filed a motion for joint administration under Fed. R. Bankr. P. 1015(b) and E.D. Mich. LBR 1015-1 seeking joint administration. If this Motion is granted, Debtors request that the order apply to all Debtors' cases.

## BACKGROUND

5.      On July 17, 2025, Holdings filed a voluntary petition for relief in this Court under chapter 11 of Title 11 of the Bankruptcy Code.

6.      On October 31, 2025, Distillery filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code.

7.      The Debtors continue in possession of their property and have continued to operate their businesses as Debtors-in-Possession pursuant to §§ 1107 (a) and 1108 of the Bankruptcy Code.

8.      No trustee, examiner, or official committee of unsecured creditors has been appointed in either of the Debtors' chapter 11 cases.

9. The Debtors have each filed this motion in their respective bankruptcy cases seeking the same relief.

10. The principal statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code, Bankruptcy Rule 4001(b) and Local Rule 4001-2.

## BACKGROUND OF THE DEBTOR

11. The background of the Distillery, including the current management team and employee makeup, is set forth in the Baker Declaration.

## THE PREPETITION SECURED CLAIMS

12. SummitBridge is the only secured creditor with an interest in the Debtors' Cash Collateral. FCLSC has filed a UCC-1 financing statement regarding Distillery to the extent that its lease of the Rickhouse is deemed a financing lease and not a true lease.

13. As of the respective Petition Dates, the Debtors were indebted, liable and obligated to SummitBridge National Investments VIII, LLC, as assignee of Truist Bank (in such capacity, the "Pre-Petition Lender")[1], as follows:

　　a. The Pre-Petition Lender made certain loan advances and provided other financial accommodations to Debtors pursuant

---

[1] Truist Bank assigned all of its right, title and interest in and to the Pre-Petition Loan Documents pursuant to that certain Loan Purchase and Sale Agreement (the "LPSA") that was effective as of March 27, 2024 (the "Loan Assignment Effective Date").

to the terms and conditions set forth in: (a) Loan Agreement dated January 17, 2023, as amended by the Amended and Restated Loan Agreement dated May 31, 2023, the First Amendment to Loan Agreement dated November 7, 2023, the Second Amendment to Amended and Restated Loan Agreement dated June 14, 2024, and the Third Amendment to Amended and Restated Loan Agreement dated August 23, 2024; (b) Promissory Note dated January 17, 2023, in the maximum principal amount of $9,500,000.00, as amended by the Addendum to Promissory Note (Term SOFR) dated January 17, 2023, the Modification to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (c) Amended and Restated Promissory Note dated May 31, 2023, in the maximum principal amount of $3,000,000.00, as amended by the Addendum to Promissory Note (Term SOFR) (Equipment Draw Loan) dated May 31, 2023, the Modification of Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January

28, 2025; (d) Promissory Note dated May 31, 2023 in the maximum principal amount of $4,000,000.00, as amended by the Addendum to Promissory Note (Term SOFR) (Real Estate Draw Loan) dated May 31, 2023, the Modification to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (e) Promissory Note dated June 14, 2024, in the maximum principal amount of $5,000,000.00, as amended by the Modification to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (f) Promissory Note dated August 23, 2024, in the maximum principal amount of $2,000,000.00, as amended by the Term SOFR Addendum to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (g) Mortgage, Fixture Filing, and Security Agreement dated as of May 31, 2023, recorded with the Boyle County Clerk's Office in Mortgage Book 834, Page 276; (h) Mortgage, Fixture Filing,

and Security Agreement dated as of August 23, 2024, recorded with the Boyle County Clerk's Office in Mortgage Book 857, Page 482; (i) Mortgage, Fixture Filing, and Security Agreement dated as of August 23, 2024, recorded with the Boyle County Clerk's Office in Mortgage Book 857, Page 502; (j) Assignment of Leases and Rents dated May 31, 2023, recorded with the Boyle County Clerk's Office in Deed Book 584, Page 535; (k) Assignment of Leases and Rents of record in Book D597, Page 40 of the Office of the Clerk of Boyle County; (l) Assignment of Leases and Rents of record in Book D597, Page 31 of the Office of the Clerk of Boyle County, Kentucky; (xiii) Security Agreement dated January 17, 2023 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (m) Security Agreement dated June 14, 2024 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (n) Security Agreement dated August 23, 2024 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (o) Security Agreement dated January 17, 2023 by LMD Holdings, LLC executed and delivered to Lender's

predecessor in interest, Truist Bank; (p) Security Agreement dated August 23, 2024 by LMD Holdings, LLC executed and delivered to Lender's predecessor in interest, Truist Bank and (q) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Pre-Petition Lender (all of the foregoing, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the respective Petition Dates, collectively, the "<u>Pre-Petition Loan Documents</u>").

14. The obligations owing to the Pre-Petition Lender by the Debtors under the Pre-Petition Loan Documents (the "<u>Pre-Petition Secured Obligations</u>") are to be treated as (i) legal, valid, binding and enforceable against Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (ii) not subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature against the Pre-Petition Lender under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. As of the Holdings Petition Date, the Pre-Petition Secured Obligations totaled not less than $25,165,186.03, exclusive of the reasonable fees and expenses payable as the

Pre-Petition Secured Obligations under the Pre-Petition Loan Documents. As of the October 31, 2025, the Pre-Petition Secured Obligations totaled not less than $26,354,270.24[2], exclusive of the reasonable fees and expenses payable as the Pre-Petition Secured Obligations under the Pre-Petition Loan Documents.

15.     Non-debtor related parties Francesco Viola, a Michigan resident, Viola Holdings, LLC ("VH"), a Michigan limited liability company, and Versatrans, Inc. ("Versatrans"), a Michigan corporation, (collectively, the "Guarantors") have guaranteed the full performance of the Pre-Petition Secured Obligations of the Debtors and are indebted to the Pre-Petition Lender in the amount of the Pre-Petition Secured Obligations pursuant to those certain guarantee agreements (collectively, the "Guarantees").[3]

16.     As of the respective Petition Dates, the Pre-Petition Secured Obligations are secured pursuant to the Pre-Petition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (the "Pre-Petition Liens") granted by the Debtors to the Pre-Petition Lender under the Pre-Petition Loan Documents, in substantially all of the existing and after-acquired assets of the Debtors as more fully set forth in the Pre-Petition Loan Documents (the "Pre-Petition Collateral") subject to any valid, enforceable,

---

[2] Per diem interest is $5,279.60.

[3] The relief sought herein is not intended to nor shall impair, modify, or otherwise affect the validity and enforceability of the Guarantees.

properly perfected, non-avoidable security interests, mortgages or liens in existence as of the respective Petition Dates in any tangible and intangible pre-petition and post-petition property of the Debtors that are senior to the Pre-Petition Liens, if any. The Debtors are presently unaware of, and have stipulated (subject to the challenge rights of a party-in-interest or any committee appointed in this Bankruptcy Case) not to assert, any claim, counterclaim, setoff or defense of any kind, nature or description against the Pre-Petition Lender that would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Lender's liens, claims or security interests in the Pre-Petition Collateral.

17. Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Pre-Petition Collateral existing as of the respective Petition Dates, and the proceeds of any of the foregoing is the Pre-Petition Lender's Cash Collateral (as defined herein).

18. The Pre-Petition Lender is entitled, pursuant to sections 361, 362(c)(2), 363(e), 364(d)(l) and 507 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral, including the Cash Collateral, to the extent of any diminution in value of the Pre-Petition Collateral

occurring from and after the respective Petition Dates, in exchange for (a) the use of Cash Collateral and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

19.    Upon entry of the Agreed Interim Order, the Debtors, their estates and the Guarantors and each of their respective successor(s) and assign(s) (collectively, the "Releasors"), will fully and forever remise, release and discharge SummitBridge and each and all of its parents, subsidiaries and affiliated corporations, companies and divisions, together with their predecessors, successors and assigns, and each and all of its or their directors, officers, employees, attorneys, accountants, consultants and other agents (collectively, the "Released Parties"), of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, costs, expenses, accountants, damages, judgments, losses, liabilities and defenses of whatsoever kind or nature, in law, equity or otherwise, whether known or unknown, which Releasors have had, may have had or now have, for or by reason of any matter, cause or thing whatsoever against the Released Parties, whenever arising to and including the date the Agreed Interim Order is entered, including, but without in any respect limiting the generality of the foregoing, any and all claims or causes of action against the Released Parties which were or might have been asserted in this Bankruptcy Case, or in any adversary proceeding that may be

commenced or may have been commenced in connection herewith (the "Released Claims").

## DEBTORS' PREPETITION ASSETS

20.     As of the Petition Date, the Debtors' assets were chiefly made up of (1) real estate, (2) equipment and vehicles used in the operations of Debtors' businesses, (3) work in process/inventory, and (4) going concern value (good will).

## EVENTS LEADING TO THE BANKRUPTCY FILING

21.     Several factors have contributed to the Debtors' decisions to file for relief under chapter 11 of the Bankruptcy Code.  The events leading up to the filing of the Bankruptcy Cases are outlined in detail in the Baker Declaration.

22.     Debtors determined, in consultation with the CRO, that the best option for preserving and maximizing value for all stakeholders is an expedited process for the sale of their businesses as a going concern in a chapter 11 bankruptcy.

23.     Debtors have agreed to a sale process with certain milestones, including:

      a.      no later than one (1) business day after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and Pre-Petition Lender, to seek joint administration of the bankruptcy cases;

      b.      no later than three (3) business days after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, to retain the CRO;

      c.      no later than five (5) business days after the Debtors retain the CRO, commence an investigation regarding all prepetition amounts transferred, distributed or repaid by the Debtors to VH

and Versatrans (the "Investigation") and, following conclusion of the Investigation, make immediate demand (the "Demand") upon VH and Versatrans, as applicable, for the immediate return of all avoidable and recoverable transfers (the "Transfers") by and between the Debtors and VH and Versatrans, respectively;

d.    within five (5) business days of the Demand, if the funds (the "Funds") associated with the Transfers are not repaid to the Debtors, commence actions (the "Chapter 5 Litigation") in this Court for the recovery of such Funds from VH and Versatrans, as applicable;

e.    within seven (7) business days after the Distillery Petition Date, file a motion (the "Sale Motion"), in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, to sell all or substantially all of their assets and business operations pursuant to the Bid Procedures (as defined herein) which provides for the indefeasible and final payment in full, in cash, of the obligations under the DIP Facility and all other obligations owing to the DIP Lender and the Pre-Petition Lender, whether arising prior to, on, or after the respective Petition Dates, upon the closing of such sale) with the closing of such sale to occur no later than 120 days after the Distillery Petition Date (inclusive of such payment in full requirement, the "Sale");

f.    within seven (7) business days after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, to approve bidding procedures for the Sale (the "Bid Procedures");

g.    no later than five (5) business days after the Distillery Petition Date, obtain entry of the Agreed Interim Order;

h.    no later than two (2) business days after the filing of the Sale Motion, distribute necessary materials with respect to the Sale to potential purchasers of the assets and business operations of the Debtors, which materials will be in a form reasonably acceptable to the DIP Lender and the Pre-Petition Lender, and

to continue to distribute such materials, as appropriate, until the applicable deadline set forth in the Bid Procedures;

i.  no later than 35 days after the Distillery Petition Date, obtain an order of this Court, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, approving the Bid Procedures;

j.  no later than 35 days after the Distillery Petition Date, obtain an order of this Court, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in its sole discretion, approving the Debtors' employment of the CRO;

k.  no later than 35 days after the Distillery Petition Date, obtain entry of the Final Order;

l.  no later than 90 days after the Distillery Petition Date, conclude the auction of the assets and business operations of the Debtors pursuant to the Bid Procedures;

m.  no later than 95 days after the Distillery Petition Date, obtain entry of an order of this Court approving the Sale, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in its discretion; and

n.  no later than 120 days after the Distillery Petition Date, close the Sale of the assets and business operations of the Debtors pursuant to the Bid Procedures and indefeasibly and finally pay the obligations under the DIP Facility and all other obligations to the DIP Lender and the Pre-Petition Lender, whether arising prior to, on, or after the respective Petition Dates, in full, in cash, at the closing of the Sale.

## THE NEED FOR § 364 CREDIT AND EFFORTS TO OBTAIN § 364 CREDIT ON MORE FAVORABLE TERMS

24.     The Debtors do not have sufficient unencumbered cash to enable them to operate and require additional liquidity to finance their current operations in the form of the § 364 financing requested in this Motion.

25.     The Debtors are unable to obtain unsecured credit sufficient to maintain operations under Bankruptcy Code section 364(a) or (b), that is, by only granting a lender administrative expense priority.

26.     The Debtors are unable to obtain credit sufficient to maintain operations under Bankruptcy Code section 364(c), that is, by granting a lender a priority administrative expense claim, by granting a lender a lien on property of their estates that is not otherwise subject to a lien, or by granting a lender a junior lien on property of the Debtors' estates that is subject to a lien.

27.     The proposed financing from the DIP Lender reflected in the DIP Credit Agreement and the Agreed Interim Order (a) is appropriate, (b) should meet the Debtors' business and financing needs for these chapter 11 cases, (c) is necessary to finance the restructuring process and allow the Debtors to pursue their restructuring goals and preserve value in these chapter 11 cases; and (d) is the most cost effective and beneficial financing – if not the only such financing – available to the Debtors.

28.     It is essential for the Debtors to immediately obtain the financing contemplated by the DIP Facility to preserve and protect the value of their estates.

Based on the Debtors' financial forecasts, the Debtors believe the funding contemplated by the DIP Facility will provide the Debtors with sufficient liquidity to continue operating and to pursue their restructuring goals.

## APPROVAL OF THE DIP LOAN DOCUMENTS

29.     The Debtors request entry of the Agreed Interim Order and Final Order authorizing them to borrow money and obtain credit from the DIP Lender under the DIP Loan Documents, and the documents to be executed in connection therewith. The following are the salient terms of the proposed DIP Loan Documents and the proposed Agreed Interim Order granting this Motion on an interim basis: [4]

> a.     **Maximum amount**: A superpriority, secured, multiple-draw term loan in an amount not to exceed the aggregate principal amount of $1,500,000.
>
> b.     **Interim financing**: Prior to entry of a Final Order, DIP Lender will provide up to $450,000 of interim financing subject to the entry of the Agreed Interim Order approving the same. The Agreed Interim Order and Final Order shall be in form and substance acceptable to the DIP Lender and Pre-Petition Lender.
>
> c.     **Interest rate**: 15%
>
> d.     **Events of Default**:  Events of default include, but not limited to:

---

[4]     This is a summary of the terms of the proposed DIP Loan Documents. Only actual terms of the proposed DIP Loan Documents should be relied upon.

i. The Debtors do not pay on the due date any amount payable pursuant to any of the DIP Loan Documents or the Agreed Interim Order at the place and in the amount required to be paid.

ii. The Debtors do not comply with any provision of the DIP Loan Documents or the Agreed Interim Order (other than those referred to in the foregoing subsection), including, without limitation, compliance with any Milestone (as defined herein).

iii. Any representation, warranty or statement made or given or deemed to be made or given by the Debtors in the DIP Loan Documents, the Agreed Interim Order or any other document delivered by or on behalf of the Debtors under or in connection with any of the DIP Loan Documents is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

iv. Any post-petition indebtedness of the Debtors to any party is not paid when due.

v. Any post-petition indebtedness of the Debtors to any party is declared to be or otherwise becomes due and payable before its specified maturity.

vi. Any commitment for any indebtedness of the Debtors is cancelled or suspended by a creditor of the Debtors as a result of an event of default (however described).

vii. Any creditor of the Debtors becomes entitled to declare any indebtedness of the Debtors due and payable before its specified maturity as a result of an event of default (however described) and receives relief from stay to exercise its remedies.

viii. It is or becomes unlawful for Debtors to perform any of their obligations under the DIP Loan Documents or the Pre-Petition Loan Documents.

ix. The Debtors repudiate any of the DIP Loan Documents or the Pre-Petition Loan Documents or evidence an intention to repudiate any of the DIP Loan Documents or the Pre-Petition Loan Documents.

x. Any DIP Loan Document or Pre-Petition Loan Document is not (or is claimed by the Debtors not to be) in full force and effect.

xi. The holder of any lien on any of the assets of the Debtors receives relief from stay to commence or attempt to commence any enforcement or remedy with respect to any such assets.

xii. The CRO is no longer retained by either or each of the Debtors.

xiii. The Court shall enter any order(s) (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Agreed Interim Order or any other order with respect to this Bankruptcy Case affecting in any material respect the DIP Loan Documents or the Pre-Petition Loan Documents, (ii) appointing a Chapter 11 trustee or an examiner in the Case with enlarged powers relating to the operation of the business of the Debtors pursuant to section 1104 of the Bankruptcy Code, (iii) dismissing this Bankruptcy Case or converting this Bankruptcy Case to a case(s) under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay for a lien on the assets of the Debtors to permit any foreclosure upon any of the DIP Collateral or the Pre-Petition Collateral.

xiv. Any order(s) is entered by this Court approving a motion filed in this Bankruptcy Case approving any superpriority claims in this Bankruptcy Case which are pari passu with or senior to the claims of the DIP Lender or the Pre-Petition Lender against the Debtors unless after giving effect to the transactions contemplated by such motion, all of the DIP Obligations (as defined in the DIP Security Agreement) and the Pre-Petition Secured Obligations shall be either (i) senior in all respects, or (ii) indefeasibly paid in full in cash in their sole discretion.

xv. Any motion shall be filed by the Debtors in either or each of the Bankruptcy Cases (i) seeking to obtain additional financing under section 364 of the Bankruptcy Code and/or to use Cash Collateral of the DIP Lender and/or the Pre-Petition Lender under section 363(c) of the Bankruptcy Code without the consent of the DIP Lender and the Pre-Petition Lender that is not subordinate to the rights and remedies of the DIP Lender and the Pre-Petition Lender hereunder or, in the alternative, does not provide for the indefeasible and immediate repayment of the DIP Obligations and the Pre-Petition Secured Obligations in cash at the closing of such new financing, (ii) subject to the entry of the Final Order, to recover from any portions of the DIP Collateral or the Pre-Petition Collateral any costs or expenses of preserving or disposing of such DIP Collateral or Pre-Petition Collateral under section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to rights and remedies of the DIP Lender or the Pre-Petition

Lender hereunder or under any of the other DIP Loan Documents, the Pre-Petition Loan Documents or the Agreed Interim Order or any Final Order entered in this Bankruptcy Case. For the avoidance of doubt, the Debtors may seek financing to pay estate expenses, the proceeds of which may be used by the Debtors, subject to further orders of this Court, to pay such expenses notwithstanding the rights and remedies of the DIP Lender and the Pre-Petition Lender, and offer liens and priority claims to a financier provided that the rights and remedies of such financier shall be subordinate in all respects to the DIP Obligations and the Pre-Petition Secured Obligations and the liens and claims associated therewith pursuant to loan documents and a subordination agreement acceptable to the DIP Lender and the Pre-Petition Lender.

xvi. This Court shall not have entered the Final Order by December 15, 2025.

xvii. The Debtors fail to be in compliance with any item on the Budget for any applicable period, subject to the Allowed Variance.

xviii. The Debtors materially fail to comply with any performance and reporting covenants contained in the Agreed Interim Order or the DIP Loan Documents, the Pre-Petition Loan Documents, or breach any provisions of the Agreed Interim Order or the DIP Loan Documents.

xix. Any material breach of (x) the Debtors' governance documents or (y) the management or operation provisions in the CRO Agreement.

e. **Borrowing conditions**: DIP Loan Documents will require adherence to weekly reporting requirements, certified by the CRO.

f. **Roll-up**: A roll-up and conversion into DIP Obligations (as defined herein) of $600,000 in Pre-Petition Secured Obligations (the "Roll-Up").

i. **DIP Liens**: As security for the DIP Obligations, effective and perfected upon entry of the Agreed Interim Order and without the necessity of the execution, recordation of filings of mortgages, security agreements, control agreements, pledge

agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a) - (d) below being collectively referred to as the "DIP Collateral"), the exclusion of Avoidance Actions and the proceeds thereof (other than proceeds of any claims asserted and recovered under Bankruptcy Code Section 549) except as expressly set forth herein as it relates to the Chapter 5 Litigation, and Permitted Third Party Liens (all such liens and security interests granted to the DIP Lender pursuant to the Agreed Interim Order and the DIP Loan Documents, the "DIP Liens"): (a) first lien on unencumbered property; (b) liens junior to holders of valid, enforceable, fully-perfected, non-avoidable liens; (c) priming liens on and security interests in the Pre-Petition Collateral; and (d) first liens on the Land Contracts.

g.     **Commitment fee**:  None.

h.     **Automatic Perfection**: DIP Liens deemed immediately effective and automatically perfected.

i.     **Funding per Budget**: the DIP loan will require adherence to the Budget, a copy of which is attached hereto as Exhibit B, subject to a 10% cumulative cash flow variance.

j.     **Payment of Professional Fees**: With respect to the Chief Restructuring Officer of the Debtors ("CRO") and counsel retained in this Bankruptcy Case for the Debtors (in the case of the Distillery Debtor, Stevenson & Bullock, P.L.C., and in the case of the Holdings Debtor, Robert N. Bassel) ("Debtor Counsel" and together with the CRO, the "Debtor Professionals"), and notwithstanding anything to the contrary herein, the Debtors shall be authorized, subject to the terms of the Budget, to fund on a weekly basis from the proceeds of the DIP Facility, an amount equal to the professional fees and expenses specified for each Debtor Professional for that week in the Budget.

      k.    **Required Adherence to Case Milestones**: Debtors must adhere to case milestones as set forth in the Agreed Interim Order.

      l.    **Section 364(e) Good Faith Protection**: The DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

## GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

30.    In addition to the use of any Cash Collateral that may be available to the Debtors, an immediate and critical need exists for the Debtors to obtain additional financing to operate and run a successful sale process. Unrestricted Cash Collateral usage alone is insufficient to enable the Debtors to continue to operate. The Debtors are unable to obtain the required financing in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1), secured debt as described in section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender. Subject to the provisions of the Agreed Interim Order, the DIP Lender has agreed to provide post-petition financing to and for the benefit of the Debtors to be used for (i) the Debtors' general working capital and operational expenses, (ii) administration of each of the Bankruptcy Cases (in each case of (i) and (ii), in accordance with a weekly cash flow budget prepared by the Debtors'

CRO, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender), and (iii) costs, expenses, closing payments, and other payment amounts contemplated in the Agreed Interim Order.

31.     Good cause has been shown for the entry of the Agreed Interim Order. Among other things, entry of the Agreed Interim Order will minimize disruption of the Debtors' business and operations and permit it to meet payroll and other operating expenses, obtain needed goods and services, and retain customer and supplier confidence by demonstrating an ability to maintain normal operations pending the prompt completion of an asset sale process. The financing arrangements authorized and set forth in the attached Agreed Interim Order are vital to avoid immediate and irreparable harm to the bankruptcy estates. Consummation of such financing therefore is in the best interest of the bankruptcy estates and their creditors.

32.     The Debtors are duly organized, validly existing entities, and have the requisite power and authority to own, lease, and operate their property, including, without limitation, the DIP collateral. The Debtors have the requisite power and authority to enter, execute, deliver, and perform the obligations under the terms of the DIP Loan Documents and to incur the obligations provided for therein. The DIP Loan Documents shall constitute the valid and legally binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms. No

consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state or other governmental authority or regulatory body, or any other Entity (as defined in the Bankruptcy Code), which has not already been obtained or done, is required in connection with the execution, delivery and performance by the Debtors of any of the documents required as a condition to the validity or enforceability of the DIP Loan Documents.

33.     The requested authorized financing has been negotiated in good faith and at arm's length. The terms of such financing are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Any credit extended and loans made to the Debtor, pursuant to the Agreed Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the DIP Lender shall have all of the protections thereunder.

34.     As adequate protection, the DIP Loan Documents provide for the Roll-Up. The Supreme Court of the United States has recently, in *dicta*, endorsed motions seeking to pay certain pre-petition claims early in a Chapter 11 case, including in the context of a roll-up, to "enable a successful reorganization and make even the disfavored creditors better off." *See Czyzewski v. Jevic Holding*

*Corp*., 137 S. Ct. 973, 985 (2017) ("Courts, for example, have approved first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims. In doing so, these courts have usually found that the distributions at issue would enable a successful reorganization and make even the disfavored creditors better off.") (internal citations and quotation marks omitted).

## USE OF CASH COLLATERAL AND
## ADEQUATE PROTECTION

35.    A potential disruption in services would be devastating to the Debtors' ability to operate and to maximize the value of their assets and to successfully liquidate for the benefit of the bankruptcy estates.  Consequently, of <u>immediate</u> urgency is the need to fund the Debtors' payroll and to satisfy post-petition obligations owed to the Debtors' post-petition creditors who will provide the goods and services needed by the Debtors.

36.    The Debtors propose to use Cash Collateral for the payment of post-petition employee wages and salaries, payroll taxes, supplies, utilities, and other post-petition general operating and working capital purposes, including amounts paid for such purposes which may constitute administrative expense claims under the Bankruptcy Code directly attributable to the operation of Debtors' business post-petition as authorized by final order of the Court.

37.     SummitBridge, as the prepetition and DIP Lender is entitled to receive

adequate protection on account of its interest in the Prepetition Collateral pursuant

to sections 361, 362, 363 and 364(d)(1)(B) of the Bankruptcy Code to the extent of

any diminution in the value of its interest in the Prepetition Collateral (including

Cash Collateral), the Debtors' use, sale or lease of such Prepetition Collateral, and

the imposition of the automatic stay (collectively, to the extent of any such

diminution in value, the "Diminution in Value").

38.     The Debtors have delivered a combined initial 13-week projected

budget to SummitBridge (the "Budget").  See **Exhibit B.**

39.     The Debtors have been in regular communication with SummitBridge

regarding the use of Cash Collateral.   The Debtors and SummitBridge have

negotiated for the consensual use of Cash Collateral subject to the entry of the

Agreed Interim Order by this Court.

40.     In its capacity as Pre-Petition Lender, SummitBridge is entitled,

pursuant to sections 361, 362(c)(2), 363(e), 364(d)(l) and 507 of the Bankruptcy

Code, to adequate protection of its interests in the Pre-Petition Collateral, including

the Cash Collateral, to the extent of any diminution in value of the Pre-Petition

Collateral occurring from and after the respective Petition Dates, in exchange for

(a) the use of Cash Collateral and (b) the imposition of the automatic stay pursuant

to section 362 of the Bankruptcy Code.

41.     To that extent, SummitBridge shall receive adequate protection as follows:

a.      *Pre-Petition Lender Replacement Liens*. The Pre-Petition Lender shall receive replacement liens in the DIP Collateral to secure the Adequate Protection Amounts (the "Replacement Liens").

b.      *Pre-Petition Lender 507(b) Claim*. The Pre-Petition Lender shall receive claims against Debtors' estates in the Adequate Protection Amounts pursuant to Section 507(b) of the Bankruptcy Code (the "507(b) Claim", and together with the Replacement Liens, the "Adequate Protection"); provided that other than proceeds of any claims asserted and recovered under Bankruptcy Code Section 549, the proceeds of Avoidance Actions shall not be made available to pay the 507(b) Claim which claim, to the extent unpaid, shall be treated as an administrative expense of the Debtors.

c.      *Priority*. The liens and claims comprising the Adequate Protection shall be senior to all liens and claims asserted by any person or entity against Debtors and its estates, except for the DIP Liens and Superpriority Claims granted to the DIP Lender

pursuant to the Agreed Interim Order and the DIP Loan Documents, and the Permitted Third Party Liens, until the Pre-Petition Secured Obligations are indefeasibly repaid in full.

42. Further, Farm Credit Mid-America asserts a mortgage lien in and to certain Pre-Petition Collateral to secure obligations owed to it by the Debtors. As adequate protection, Farm Credit Mid-America is granted (i) a replacement lien in the DIP Collateral with the same validity, priority and extent as its purported lien in the Pre-Petition Collateral and the proceeds thereof; and (ii) monthly payments in the amount of $17,711 subject to a full reservation of rights and subject to disgorgement, setoff or other appropriate remedy in the event it is ultimately determined that the asserted Farm Credit Mid-America mortgage and lien is unenforceable or not validly perfected.

43. Additionally, FCLSC has filed a prepetition Article 9 financing statement. To the extent that its interest in the Rickhouse is deemed a security interest and not a true lease, as adequate protection, FCLSC is granted (i) a replacement lien in the DIP Collateral with the same validity, priority and extent as its purported lien in the Pre-Petition Collateral and the proceeds thereof; and (ii) monthly payments in the amount of $19,001, subject to a full reservation of rights and subject to disgorgement, setoff or other appropriate remedy in the event it is ultimately determined that the asserted FCLSC lien is unenforceable or not validly

perfected, and that the payments to FCLSC were not properly paid as lease payments.

44.     Based on the critical need to protect Debtors' ability to operate and the preservation of the value of the Debtors' estates, the Debtors believe that they should be permitted to use the post-petition Cash Collateral to fund ongoing post-petition operations only.

## RELIEF REQUESTED

45.     The Debtors seek an order pursuant to sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code: (a) authorizing use of Cash Collateral pursuant to the terms of the Agreed Interim Order; (b) granting and affirming to the extent necessary, the adequate protection given to SummitBridge, in respect of its interest in the Pre-Petition Collateral, (c) authorizing the Debtors to obtain post-petition senior secured financing in the maximum amount $1,600.000.00, and (d) scheduling the Final Hearing.

46.     Bankruptcy Rule 4001(d) provides that the court may fix the time within which objections to the approval of an agreement relating to the use of cash collateral, granting adequate protection pursuant to section 363 of the Bankruptcy Code must be filed.  In addition, the Court is empowered to conduct an expedited preliminary hearing on the Motion and grant the relief requested herein to the

extent necessary to avoid immediate and irreparable harm to the Debtors' bankruptcy estates.

47. The Debtors do not have viable alternative sources of financing readily available with terms the same or better than those proposed in the DIP Loan Documents. The Debtors' prepetition secured debt, which encumbers all of the Debtors' assets, is in default, and the Debtors have no unencumbered assets to satisfy obligations to a post-petition lender. Consequently, the availability of, and options for, the Debtors' post-petition financing, are limited and the Debtors lack time to explore opportunities with alternative funding sources.

48. If the Debtors are to proceed with the completion of a constructive and managed sale process, it must proceed with the DIP financing proposal from the DIP Lender.

49. The Debtors will continue to need the use of the Cash Collateral to pay necessary post-petition expenditures, consistent with the proposed Budget, to maintain the ability to service customers and continue operations for the benefit of creditors. These expenditures will enable the Debtors to continue operating post-petition, fund the Debtors' payroll, and preserve the Pre-Petition Collateral. Without the authority to use Cash Collateral, the Debtors will not have working capital needed to operate, pay employees, or maintain operations post-petition to protect the bankruptcy estate.

50.     Pursuant to Sections 363(c)(2) and 363(e) of the Bankruptcy Code, the Debtors are permitted to use the Cash Collateral as the Debtors are providing the pre-petition secured creditor with an interest in the cash Collateral with adequate protection.  "Adequate protection" is not defined in the Bankruptcy Code, although 11 U.S.C. § 361 sets forth three (3) non-exclusive methods of how an interest in property may be adequately protected.  *In re Shriver*, 33 B.R. 176, 186 (Bankr. N.D. Ohio 1983).

51.     Adequate protection is aptly described as "a balancing of the Debtors' and a creditor's respective harm."  *In re Carson,* 34 B.R. 502, 505 (Bankr. D. Kan. 1983) (citation omitted).  The legislative history of Section 361 of the Bankruptcy Code reflects Congress' intent to give the Court flexibility to fashion adequate protection in light of the facts and equitable considerations in each case.  *E.g., O'Connor*, 808 F.2d at 1396-97 (10th Cir. 1987); *In re 5-Leaf Clover Corp.,* 6 B.R. 463, 466 (Bankr. S.D. W. Va. 1980); *see also In re Harrington & Richardson, Inc.,* 48 B.R. 431, 433 (Bankr. D. Mass. 1985) (noting that adequate protection is "a flexible concept which requires a Court to make decisions on a case-by-case basis.").  For example, in determining what constitutes "adequate protection," courts must consider not only the interests of the secured creditor whose cash collateral is affected, but the interests of all other creditors in light of the Debtors' efforts to enhance the prospects of reorganization.  *O'Connor,* 808 F.2d at 1397-98.

52.     To say that a secured creditor is entitled to adequate protection means that the secured creditor is entitled to assurance that the value of its lien will not decrease as a result of the automatic stay and if it does, that it will receive something as compensation for the decrease. *In re Ramco Well Service, Inc.,* 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983).

53.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15-day period following the filing of a motion requesting authorization to use cash collateral, "only . . .as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2).   In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 449 (D. Co. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bank S.D. N.Y. 1990).

54.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). To use cash collateral without the lienholder's consent and to use other property in which a creditor claims an interest, the debtor is required to

provide the lienholder with adequate protection of its interest in the cash collateral and other property in which an interest is claimed. The term "adequate protection" is defined in Section 361 of the Bankruptcy Code. Adequate protection may be provided by granting a lienholder an additional or replacement lien to the extent that the stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property. 11 U.S.C. § 361(2).

55.     Adequate protection must be determined on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *In re Ledgmere Land Corp.*,116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Kain*. 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

56.     Section 364(c) of the Bankruptcy Code provides that:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or, 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

57.    The entry of the Agreed Interim Order will enable the Debtors to use cash collateral and fund the Debtors' immediate post-petition needs (including the funding of payroll), as well as other post-petition needs of this case as the Debtors endeavors to achieve the benefits of a meaningful and successful chapter 11 proceeding.

58.    Conversely, immediate irreparable harm will occur to the Debtors, their customers, employees, creditors, and the bankruptcy estate if the Debtors are not permitted to use Cash Collateral.  In the absence of a court order authorizing the use of the Cash Collateral, the Debtors will be unable to meet post-petition payroll and other operating expenses and will be forced to cease operations immediately, rather than continuing efforts to maximize value of its assets for the benefit of its estate and creditors.  Thus, an inability to use Cash Collateral would cause substantial and immediate harm to the detriment of all of the Debtors' creditors and customers.  *In re Marion Street Partnership,* 108 B.R. 218 (Bankr. D. Minn. 1989) (debtor was authorized to use cash collateral to pay operating expenses where the debtor could not operate for even one day without the use of cash collateral).

59.     Accordingly, the Debtors respectfully submit that the use of the Cash Collateral on the terms set forth in the Agreed Interim Order is in the best interest of the Debtors, customers, the bankruptcy estates, creditors, and all parties in interest.

## REQUEST FOR FINAL HEARING

60.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request the Court set a date for the Final Hearing.

## NOTICE

61.     Pursuant to Local Rule 4001-2(c)(4) the Debtors shall serve the following parties with a copy of this Motion and notice of the interim hearing date: (i) the United States Trustee for the Eastern District of Michigan; (ii) SummitBridge; (iii) Farm Credit Leasing Services Corporation; (iv) Farm Credit Mid-America; (v) the parties included on the Debtors' lists of twenty (20) largest unsecured creditors; and (vi) those parties that have requested notice pursuant to Bankruptcy Rule 2002 with notice of this motion.

62.     The Debtors intend to request that the Court consider the interim relief requested in this Motion on an expedited basis, and have, contemporaneously with the filing of this Motion, requested the same from the Court as is authorized pursuant to E.D. Mich. LBR 9013-1(c).

## NO PRIOR REQUEST

63. No previous motion for the requested relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Agreed Interim Order attached hereto as Exhibit 1 and grant such other and further relief as is just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

__/s/ Robert Bassel _____
ROBERT N. BASSEL (P48420)
Attorneys for Debtor
P.O. Box T
Clinton, MI 49236
(248) 677-1234
bassel@gmail.com

</div>

Dated: November 12, 2025

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

In Re:

LMD HOLDINGS, LLC.                    Case No. 25-47214-prh
                                      Chapter 11
           Debtor.                    Hon. Paul R. Hage
_____/

**AGREED INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A)
OBTAIN POST-PETITION FINANCING AND (B) USE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III)
SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED
RELIEF**

Upon the motion (the "**Motion**")[1] dated November 12, 2025, of LMD

Holdings, LLC (the "**Holdings Debtor**") and Luca Mariano Distillery, LLC (the

"**Distillery Debtor**", collectively, with the Holdings Debtor, the "**Debtors**"), as

Debtors in the above-captioned chapter 11 cases (collectively, this "**Bankruptcy**

**Case**"), pursuant to sections 105, 361, 362, 363, 364 and 507(b) of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy**

**Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "**Bankruptcy Rules**") and Rule 4001-2 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the Eastern District of Michigan (the "**Local Rules**"), seeking entry of this

---

[1] All capitalized terms used herein but not otherwise defined have the meanings
given to them in the Motion.

agreed interim order (the "**Agreed Interim Order**"), which provides for, among other things:

(1)    authorization for the Debtors to obtain post-petition financing to be provided by SummitBridge National Investments VIII, LLC ("**SummitBridge**" or the "**DIP Lender**"), consisting of a superpriority, secured, multiple-draw term loan in an amount not to exceed the aggregate principal amount of  $1,500,000 (the "**DIP Facility**"):

(i) comprised of (x) upon entry of this Agreed Interim Order and satisfaction or waiver of the terms and conditions set forth in the DIP Loan Documents (as defined herein), $450,000 (the "**Interim Draw**"), (y) a roll-up and conversion into DIP Obligations (as defined herein) of $600,000 in Pre-Petition Secured Obligations (the "**Roll-Up**"), and (z) subject to and upon entry of the proposed final order (the "**Final Order**"), the remaining balance available under the DIP Facility shall be made available to the Debtors subject to the terms and conditions set forth in the DIP Loan Documents (the "**Final Draw**"); and

(ii) evidenced by (a) this Agreed Interim Order, (b) the Final Order, (c) that certain Post-Petition Financing Note in the form attached to the Motion (the "**DIP Note**"), and (d) all other documents executed by the parties in connection with the DIP Facility (collectively the "**DIP Loan Documents**");

(2)    authorization for the Debtors to execute and enter into the DIP Loan Documents, to incur all obligations owing thereunder and under the DIP Loan Documents to the DIP Lender (as more fully set forth herein), enter into and perform all such other and further acts as may be required in connection with the DIP Facility, the DIP Loan Documents, and this Agreed Interim Order;

(3)    authorization for the Debtors to use the DIP Facility and the proceeds thereof in accordance with this Agreed Interim Order, the DIP Loan Documents and the initial budget attached hereto as Exhibit A (the "**Budget**");

(4)    authorization for the Debtors to effectuate the Roll-Up in accordance with the DIP Documents, this Agreed Interim Order and the Final Order;

(5)    authorization for the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Agreed Interim Order;

(6)    the grant to the DIP Lender of valid, enforceable, non-avoidable, automatically and fully perfected priming, where applicable and in accordance with the terms of this Agreed Interim Order, security interests, liens and superpriority claims, including (i) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code and (ii) liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the DIP Collateral (as defined herein) (and all proceeds thereof), including,

without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations (as defined herein);

(7)    the grant of adequate protection to (x) Farm Credit Mid-America, ACA ("**Farm Credit Mid-America**") and (y) Farm Credit Leasing Services Corporation ("**FCLSC**") in connection with any actual diminution in value of their collateral granted pursuant to their loan documents with the Debtors, whose valid, enforceable, properly perfected and non-avoidable liens and security interests, if any, are not being primed by the financing provided in the DIP Loan Documents and in this Agreed Interim Order;

(8)    the grant of adequate protection to the Pre-Petition Lender (as defined herein) in connection with any diminution in value of the Pre-Petition Collateral (as defined herein) granted pursuant to the Pre-Petition Loan Documents (as defined herein);

(9)    authorization for the Debtors to use Cash Collateral (as defined herein) in accordance with the terms of this Agreed Interim Order and the Budget in which (y) the Pre-Petition Lender has an interest and (z) Farm Credit Mid-America asserts an interest by way of the Farm Credit Mortgage (as defined herein) to the extent, with respect to Farm Credit Mid-America, such Cash Collateral is generated as proceeds post-Petition Date by the Holdings Debtor from the LMD Real Property (as defined herein);

(10)   approval of certain stipulations by the Debtors with respect to the Pre-Petition Loan Documents and the liens and security interests granted thereby and arising therefrom;

(11)   the waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Agreed Interim Order and, upon entry, the Final Order; and

(12)   the scheduling of a final hearing (the "**Final Hearing**") to be held no later than thirty (30) days following entry of this Agreed Interim Order to consider entry of the Final Order approving, on a final basis, the relief requested in the Motion, and to approve the DIP Facility on a final basis.

This Court, having considered the Motion, this proposed Agreed Interim Order, the Declaration of David Baker, CTP in Support of First Day Pleadings, the pleadings filed with this Court, the evidence submitted and arguments proffered or adduced at the hearing on the Motion held before this Court on November 14, 2025 (the "**Interim Hearing**"), and upon the record of this Bankruptcy Case; and due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been given, including to: (a) any party asserting an interest in Debtors' assets of which Debtors are aware; (b) the United States Attorney for the Eastern District of Michigan; (c) the Internal Revenue Service; (d) the United States Trustee for the Eastern District of Michigan; (e) all parties who have timely

filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; (f) Debtors' lists of creditors filed pursuant to Bankruptcy Rule 1007(d) (twenty (20) largest unsecured creditors); (g) counsel for the Pre-Petition Lender, (h) counsel to the DIP Lender, (i) counsel for Farm Credit Mid-America, and (j) counsel for FCLSC; and it appearing to this Court that extraordinary circumstances exist and that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1. *Disposition*. The Motion is granted on an interim basis in accordance with the terms of this Agreed Interim Order. Any objections to the Motion with respect to the entry of this Agreed Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.     *Jurisdiction and Venue*.     This Court has jurisdiction over this Bankruptcy Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     *Notice*.     The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.   Notice of the Interim Hearing and the emergency relief requested in the Motion was provided on November 14, 2025, to certain parties in interest, as set forth above.   The interim relief granted herein is necessary to avoid immediate and irreparable harm to Debtors and their estates pending the Final Hearing.   The notice given of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules of this Court.   No further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

*4.     Petition Date*.        On July 17, 2025 (the "**Holdings Petition Date**"), the Holdings Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   On November 12, 2025, the Distillery Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Distillery Petition Date**" and collectively with the Holdings Petition Date, the "**Petition Dates**").

5. *Debtors' Stipulations*.    The Debtors admit, stipulate and agree (*provided* that no such stipulations or agreements shall limit, impair or modify in any way the rights, protections or remedies of the DIP Lender, including, with respect to any default or event of default under any of the DIP Loan Document), that:

(a)    As of the respective Petition Dates, the Debtors were indebted, liable and obligated to SummitBridge National Investments VIII, LLC, as assignee of Truist Bank (in such capacity, the "**Pre-Petition Lender**")[2], as follows:

i.    The Pre-Petition Lender made certain loan advances and provided other financial accommodations to the Debtors pursuant to the terms and conditions set forth in: (a) Loan Agreement dated January 17, 2023, as amended by the Amended and Restated Loan Agreement dated May 31, 2023, the First Amendment to Loan Agreement dated November 7, 2023, the Second Amendment to Amended and Restated Loan Agreement dated June 14, 2024, and the Third Amendment to Amended and Restated Loan Agreement dated August 23, 2024; (b) Promissory Note dated January 17, 2023, in the maximum principal amount of $9,500,000.00, as amended by the Addendum to Promissory Note (Term SOFR) dated January 17, 2023, the Modification to Promissory Note dated August 23,

---

[2] Truist Bank assigned all of its right, title and interest in and to the Pre-Petition Loan Documents pursuant to that certain Loan Purchase and Sale Agreement (the "**LPSA**") that was effective as of March 27, 2024 (the "**Loan Assignment Effective Date**").

2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (c) Amended and Restated Promissory Note dated May 31, 2023, in the maximum principal amount of $3,000,000.00, as amended by the Addendum to Promissory Note (Term SOFR) (Equipment Draw Loan) dated May 31, 2023, the Modification of Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (d) Promissory Note dated May 31, 2023 in the maximum principal amount of $4,000,000.00, as amended by the Addendum to Promissory Note (Term SOFR) (Real Estate Draw Loan) dated May 31, 2023, the Modification to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (e) Promissory Note dated June 14, 2024, in the maximum principal amount of $5,000,000.00, as amended by the Modification to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (f) Promissory Note dated August 23, 2024, in the maximum principal amount of $2,000,000.00, as amended by the Term SOFR Addendum to Promissory Note dated August 23, 2024, the Modification to Promissory Note dated October 11, 2024, and the Modification to Promissory Note dated January 28, 2025; (g) Mortgage, Fixture

Filing, and Security Agreement dated as of May 31, 2023, recorded with the Boyle County Clerk's Office in Mortgage Book 834, Page 276; (h) Mortgage, Fixture Filing, and Security Agreement dated as of August 23, 2024, recorded with the Boyle County Clerk's Office in Mortgage Book 857, Page 482; (i) Mortgage, Fixture Filing, and Security Agreement dated as of August 23, 2024, recorded with the Boyle County Clerk's Office in Mortgage Book 857, Page 502; (j) Assignment of Leases and Rents dated May 31, 2023, recorded with the Boyle County Clerk's Office in Deed Book 584, Page 535; (k) Assignment of Leases and Rents of record in Book D597, Page 40 of the Office of the Clerk of Boyle County; (l) Assignment of Leases and Rents of record in Book D597, Page 31 of the Office of the Clerk of Boyle County, Kentucky; (xiii) Security Agreement dated January 17, 2023 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (m) Security Agreement dated June 14, 2024 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (n) Security Agreement dated August 23, 2024 by Luca Mariano Distillery, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (o) Security Agreement dated January 17, 2023 by LMD Holdings, LLC executed and delivered to Lender's predecessor in interest, Truist Bank; (p) Security Agreement dated August 23, 2024 by LMD Holdings, LLC executed and delivered to Lender's predecessor in interest, Truist Bank and (q) all

other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Pre-Petition Lender (all of the foregoing, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the respective Petition Dates, collectively, the "**Pre-Petition Loan Documents**").

      ii.      The obligations owing to the Pre-Petition Lender by the Debtors under the Pre-Petition Loan Documents (the "**Pre-Petition Secured Obligations**") shall be treated as (i) legal, valid, binding and enforceable against Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (ii) not subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature against the Pre-Petition Lender under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. As of the Holdings Petition Date, the Pre-Petition Secured Obligations totaled not less than $25,165,186.03, exclusive of the reasonable fees and expenses payable as the Pre-Petition Secured Obligations under the Pre-Petition Loan Documents. As of the October 31, 2025, the Pre-Petition Secured Obligations totaled not less than $26,354,270.24[3], exclusive of the reasonable fees and expenses payable as the Pre-Petition Secured Obligations under the Pre-Petition Loan Documents.

[3] Per diem interest is $5,279.60.

iii.     Non-debtor related parties Francesco Viola, a Michigan resident, Viola Holdings, LLC ("**VH**"), a Michigan limited liability company, and Versatrans, Inc. ("**Versatrans**"), a Michigan corporation, (collectively, the "**Guarantors**") have guaranteed the full performance of the Pre-Petition Secured Obligations of the Debtors and are indebted to the Pre-Petition Lender in the amount of the Pre-Petition Secured Obligations pursuant to those certain guarantee agreements (collectively, the "**Guarantees**").[4]

iv.     As of the respective Petition Dates, the Pre-Petition Secured Obligations shall be deemed secured pursuant to the Pre-Petition Loan Documents by valid, perfected, enforceable and non-avoidable security interests and liens (the "**Pre-Petition Liens**") granted by the Debtors to the Pre-Petition Lender under the Pre-Petition Loan Documents, in substantially all of the existing and after-acquired assets of the Debtors as more fully set forth in the Pre-Petition Loan Documents (the "**Pre-Petition Collateral**") subject to any valid, enforceable, properly perfected and non-avoidable security interests, mortgages or liens in existence as of the respective Petition Dates in any tangible and intangible pre-petition and post-petition property of the Debtors that are senior to the Pre-Petition Liens, if any, including, but not limited to, the Farm Credit Mortgage on the LMD Real Property to the extent the Farm Credit Mortgage is valid,

---

[4] Nothing herein is intended to nor shall impair, modify, or otherwise affect the validity and enforceability of the Guarantees.

enforceable, properly perfected and non-avoidable.[5]   The Debtors are presently unaware of, and have stipulated (subject to the challenge rights of a party-in-interest or any committee appointed in this Bankruptcy Case) not to assert, any claim, counterclaim, setoff or defense of any kind, nature or description against the Pre-Petition Lender that would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Lender's liens, claims or security interests in the Pre-Petition Collateral.

(b)     As of the Holdings Petition Date, the Holdings Debtor was indebted, liable and obligated to Farm Credit Mid-America as follows:

i.     On March 27, 2020, Farm Credit Mid-America and Francesco Viola executed a note, with a principal amount of $1,800,000.00 at a 3.200% interest rate (the "**March 2020 Note**").  As collateral for the March 2020 Note, the Holdings Debtor granted a mortgage (the "**March 2020 Mortgage**") on the Debtor's real property located at 1695 Old Lancaster Road, Danville, Kentucky 40422 (the "**Danville Property**").

ii.     On April 22, 2022, Farm Credit Mid-America and the Holdings Debtor executed a second note, with a principal amount of $815,589.62 at a 5.700% annual interest rate (the "**April 2022 Note**," together with the March

---

[5] Provided that nothing herein shall limit the rights of the Pre-Petition Lender to the extent such liens are not permitted thereunder or otherwise not entitled to priority under applicable law (including applicable contract law).

2020 Note and all related loan documents for both notes, the "**Farm Credit Mid-America Loan Documents**").  As collateral for the April 2022 Note, the Holdings Debtor granted a mortgage (the "**April 2022 Mortgage**," and together with the March 2020 Mortgage the "**Farm Credit Mortgage**") on certain of the Debtor's real property located in Boyle County, Kentucky and all improvements thereon (together with the Danville Property, the "**LMD Real Property**").

        iii.      As of the Holdings Petition Date, the Holdings Debtor's outstanding monetary obligations under the March 2020 Note and April 2022 Note were no less than $2,038,069.88 in the aggregate, which amount has increased since then with default rate interest, fees, penalties, attorneys' fees, costs and other amounts owed under the Farm Credit Loan Documents (collectively, all amounts owed are the "**Farm Credit Mid-America Obligations**").

        iv.      Non-debtor related party Francesco Viola, a Michigan resident, is fully responsible for the Farm Credit Mid-America Obligations and nothing herein shall waive, modify or otherwise impair Farm Credit Mid-America's claims and causes of action against Francesco Viola.

        v.      As of the Holdings Petition Date, the Farm Credit Mid-America Obligations shall be deemed secured pursuant to the Farm Credit Mid-America Loan Documents by valid, perfected, enforceable and non-avoidable security interests, liens and mortgages – including the Farm Credit Mortgage –

granted by the Holdings Debtor to Farm Credit Mid-America on the LMD Real Property and other collateral set forth in the Farm Credit Mid-America Loan Documents. The Debtors are presently unaware of, and have stipulated (subject to the challenge rights of a party-in-interest or any committee appointed in this Bankruptcy Case) not to assert, any claim, counterclaim, setoff or defense of any kind, nature or description against Farm Credit Mid-America that would in any way affect the validity, enforceability and non-avoidability of any of Farm Credit Mid-America's liens, claims or security interests.

(c) Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Pre-Petition Collateral existing as of the respective Petition Dates, and the proceeds of any of the foregoing is the Pre-Petition Lender's Cash Collateral (as defined herein); provided, however, that Farm Credit Mid-America asserts an interest in any Cash Collateral, if any, generated as proceeds post-Petition Date by the Holdings Debtor from the LMD Real Property, which Farm Credit Mid-America would have an interest in by way of the Farm Credit Mortgage.

(d) The Pre-Petition Lender is not a control person or insider of the Debtors by virtue of any of the actions taken by the Pre-Petition Lender with

respect to, in connection with, related to or arising from the Pre-Petition Loan Documents; and the Debtors agree not to assert against the Pre-Petition Lender any such allegations it may have or make against Truist Bank for actions taken by Truist Bank (i) prior to the Loan Assignment Effective Date or (ii) subsequent to the Loan Assignment Effective Date to the extent that said allegations relate solely to the acts and conduct of Truist Bank, and not the acts and conduct of the Pre-Petition Lender.

(e)     The Pre-Petition Lender is entitled, pursuant to sections 361, 362(c)(2), 363(e), 364(d)(l) and 507 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral, including the Cash Collateral, to the extent of any diminution in value of the Pre-Petition Collateral occurring from and after the respective Petition Dates, in exchange for (a) the use of Cash Collateral and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

(f)     The liens granted to the DIP Lender, once perfected under the DIP Loan Documents, applicable law, and this Agreed Interim Order, shall be valid, enforceable, properly perfected and non-avoidable liens against the Debtors and their estates.

(g)     The Debtors, their estates and the Guarantors and each of their respective successor(s) and assign(s) (collectively, the "**Releasors**"), do hereby

fully and forever remise, release and discharge SummitBridge and Farm Credit Mid-America and each and all of their parents, subsidiaries and affiliated corporations, companies and divisions, together with their predecessors, successors and assigns, and each and all of its or their directors, officers, employees, attorneys, accountants, consultants and other agents (collectively, the "**Released Parties**"), of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, costs, expenses, accountants, damages, judgments, losses, liabilities and defenses of whatsoever kind or nature, in law, equity or otherwise, whether known or unknown, which Releasors have had, may have had or now have, for or by reason of any matter, cause or thing whatsoever against the Released Parties, whenever arising to and including the date this Agreed Interim Order is entered, including, but without in any respect limiting the generality of the foregoing, any and all claims or causes of action against the Released Parties which were or might have been asserted in this Bankruptcy Case, or in any adversary proceeding that may be commenced or may have been commenced in connection herewith (the "**Released Claims**").

6. *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a) Good and sufficient cause has been shown for the entry of this Agreed Interim Order.

(b)     The Debtors have an immediate and critical need to obtain financing pursuant to the DIP Facility in order to provide, among other things, sufficient liquidity to allow the Debtors to operate their businesses in the ordinary course of business.

(c)     The Debtors and their estates are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Facility and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lender the DIP Liens and the Superpriority Claims (as defined herein) under the terms and conditions set forth in this Agreed Interim Order and in the DIP Loan Documents.

(d)     The terms of the DIP Facility and DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and the DIP Obligations constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility and DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' indebtedness and obligations owing to the DIP Lender, including the priority thereof, arising under, in respect of or in connection

with the DIP Facility and DIP Loan Documents, including, without limitation: (i) the DIP Note; (ii) obligations under the DIP Facility, including but not limited to any obligation to indemnify the DIP Lender, and to pay the DIP Lender's reasonable fees and expenses, including but not limited to its professional fees (all of the foregoing in clauses (i) and (ii) collectively, the "**DIP Obligations**"); and (iii) any liens and security interests and the priority thereof granted by this Agreed Interim Order and the DIP Loan Documents, shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364 of the Bankruptcy Code, and the DIP Lender shall be entitled to the full protection of section 364 of the Bankruptcy Code in the event that this Agreed Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     As a condition to entry into a DIP Loan Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Lender and the Pre-Petition Lender have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall (i) utilize the proceeds of the DIP Collateral in accordance with this Agreed Interim Order, (ii) retain the CRO (as defined herein) in accordance with the terms of the engagement agreement (the "**CRO Agreement**") between the Debtors and the CRO, (iii)

subject to the approval of the CRO, continue to retain Robert Bassel, as counsel for the Holdings Debtor, and Stevenson & Bullock, P.L.C. as counsel for the Distillery Debtor, with compensation in an amount set forth in Budget and in accordance with the terms of this Agreed Interim Order, and (iv) subject to this Court's approval, pay to the DIP Lender and the Pre-Petition Lender, as applicable, all Funds (as defined herein) recovered from VH and Versatrans in the Chapter 5 Litigation (as defined herein).

(g)    In addition, as a condition to entry into a DIP Loan Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Lender and the Pre-Petition Lender have agreed that, as of and commencing on the date of the Interim Hearing the Debtors' exclusive right to file a chapter 11 plan and obtain acceptance of such plan under section 1121 of the Bankruptcy Code is terminated as to SummitBridge, in its capacity as the Pre-Petition Lender and the DIP Lender.

(h)    The conversion or roll-up of a portion of the Pre-Petition Secured Obligations owed to the Pre-Petition Lender under the Pre-Petition Loan Documents (the "**DIP Lender Prepetition Obligations**") into DIP Obligations in connection with the DIP Facility, including the Roll-Up, is compensation for, in consideration of, and solely for account of, the agreement of the DIP Lender to fund amounts under the DIP Loan Documents, not as payments under, adequate

protection for, or otherwise on account of the DIP Lender Prepetition Obligations. The Roll-Up reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. The Pre-Petition Lender would not otherwise consent to the use of its Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Facility or extend credit to the Debtors without the Roll-Up. The Roll-Up will benefit the Debtors and their estates because they will enable the Debtors to obtain urgently needed financing critical to administering this Bankruptcy Case and funding their operations, which financing would not otherwise be available

(i)     In light of the DIP Lender's and the Pre-Petition Lender's consent to the payment (in a manner consistent with the Budget, and subject to the terms and conditions of this Agreed Interim Order) of certain expenses of administration of this Bankruptcy Case, including the Weekly Professional Fees Funding (as defined herein), the Debtors shall waive any "equities of the case" exception under section 552(b) of the Bankruptcy Code and the equitable doctrine of marshaling and other similar doctrines.

(j)     The DIP Lender does not control the Debtors or their properties or operations, nor does it have authority to determine the manner in which any Debtors' operations are conducted, nor is the DIP Lender a  control person or insider of the Debtors or any of their affiliates.

(k)     The Pre-Petition Lender is entitled to receive adequate protection as set forth in this Agreed Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any diminution in value of its interests in the Pre-Petition Collateral (including Cash Collateral).

(l)     Farm Credit Mid-America is entitled to receive adequate protection as set forth in this Agreed Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any diminution in value of its interests in the collateral granted pursuant to its loan documents with the Debtors (including Cash Collateral and the LMD Real Property).  Specifically, and subject to entry of the Agreed Interim Order, Farm Credit Mid-America will receive adequate protection payments from the Debtors in the amounts set forth in the Budget.

(m)     The Debtors have requested entry of this Agreed Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief set forth in this Agreed Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility in accordance with this Agreed Interim Order and other governing documents is therefore in the best interests of the Debtors' estates.

(n)     To the extent that FCLSC has a prepetition security interest in Debtors' prepetition assets, FCLSC is entitled to receive adequate protection as set

forth in this Agreed Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any diminution in value of its interests in the collateral granted pursuant to its loan documents with the Debtors.

7. *Authorization of the DIP Facility and Conditions Precedent.*

(a) The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Loan Documents and such other and further acts as may be necessary, appropriate or desirable in connection, subject to the terms, conditions and limitations of this Agreed Interim Order and the Loan Documents. The Debtors are hereby authorized to borrow money in an aggregate principal amount of up to the amount of the Interim Draw prior to entry of a Final Order pursuant to the terms and conditions governing the DIP Facility and the DIP Loan Documents, including the Roll-Up (in each case plus interest, fees, and other expenses and amounts provided by the DIP Facility, the DIP Loan Documents, and this Agreed Interim Order), which borrowings shall be used for all purposes permitted by the DIP Facility, the DIP Loan Documents, and this Agreed Interim Order, including, without limitation, pursuant to the Budget, to provide for ongoing working capital for the Debtors and other operational needs and to pay fees and expenses in accordance with this Agreed Interim Order and the DIP Loan Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements and financing statements), and to pay all fees required or necessary for performance of the DIP Obligations under the DIP Facility, including, without limitation:

(i)     the execution, delivery and performance of the DIP Loan Documents and any exhibits attached thereto;

(ii)     the non-refundable and indefeasible payment to the DIP Lender of the fees and any amounts due (or that may become due) arising from or relating to: (a) the indemnification obligations referred to in the DIP Loan Documents; (b) any and all reasonable fees and expenses of the DIP Lender's professionals incurred prior to and in connection with closing the DIP Facility; and (c) any and all costs and expenses as may be due from time to time, including, without limitation, the reasonable fees and expenses of the DIP Lender's professionals referenced in the Budget, each without the need to file retention motions or fee applications, or to provide notice to any party other than as set forth in this Agreed Interim Order other than such notice as may be required herein; and

(iii)     the performance of all other acts required under or in connection with the DIP Facility and DIP Loan Documents.

(c)     Upon the Debtors' execution and delivery of the DIP Loan Documents, the DIP Loan Documents and DIP Obligations shall constitute valid, binding and unavoidable obligations of the Debtors, enforceable against Debtors in accordance with the terms thereof and of this Agreed Interim Order.     No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Agreed Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, any claim or cause of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

(d)     Effective immediately upon the entry of this Agreed Interim Order, and without any further action by any party to the DIP Loan Documents or the other DIP Documents, this Court or any other Person, (i) the Roll-Up shall be, on a cashless basis, automatically deemed to constitute DIP Obligations (on a dollar-for-dollar basis) which shall be due and payable in accordance with the terms and conditions set forth in the DIP Loan Documents as if originally funded

hereunder on the date of this Agreed Interim Order and (ii) from and after the entry of this Agreed Interim Order, the DIP Lender Prepetition Obligations shall be automatically and irrevocably reduced by the amount of the Roll-Up. The Roll-Up shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lender to fund the DIP Facility and not as adequate protection for, or otherwise on account of, the DIP Lender Prepetition Obligations.

       8.    *Superpriority Claims for DIP Lender.*

       (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against Debtors with priority over any and all administrative expenses, diminution claims and all other claims against Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof;

provided that other than proceeds of any claims asserted and recovered under Bankruptcy Code Section 549, except as expressly set forth herein as it relates to the Chapter 5 Litigation, the proceeds of Avoidance Actions shall not be made available to pay the Superpriority Claims which claims, to the extent unpaid, shall be treated as administrative expenses of the Debtors.

9. *DIP Liens*. As security for the DIP Obligations, effective and perfected upon entry of this Agreed Interim Order and without the necessity of the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a) - (d) below being collectively referred to as the "**DIP Collateral**"), the exclusion of Avoidance Actions and the proceeds thereof (other than proceeds of any claims asserted and recovered under Bankruptcy Code Section 549) except as expressly set forth herein as it relates to the Chapter 5 Litigation, and Permitted Third Party Liens[6] (all such liens and

---

[6] "**Permitted Third Party Liens**" shall mean (i) any liens that are senior by operation of law (including liens securing the payment of real property taxes and any such liens that are perfected subsequent to the respective Petition Dates as permitted by Bankruptcy Code Section 546(b)) or that were, as of the respective Petition Dates, valid, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens; and (ii) any liens permitted under the Pre-Petition Loan Documents.

security interests granted to the DIP Lender pursuant to this Agreed Interim Order and the DIP Loan Documents, the "**DIP Liens**"):

(a)    *First Lien on Unencumbered Property*.   Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority senior liens on and security interests in all unencumbered property of the Debtors whether existing on the respective Petition Dates or thereafter acquired, including, without limitation, all Debtors' right, title and interest in and to all the Pre-Petition Collateral and all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash, if any, (and any investment of such cash) of the Debtors; all equipment, all goods, all accounts, cash, payment intangibles, bank accounts, and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the respective Petition Dates) to the fullest extent permitted under applicable law; all insurance policies and proceeds thereof; equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all

owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors, including, without limitation, any and all commercial tort claims against White Dog Trading and Storage, LLC, including claims for fraud, breach of fiduciary duty, negligence, or any other business-related wrongful acts, and all proceeds thereof, asserted or to be asserted against White Dog Trading and Storage, LLC in (i) *White Dog Trading and Storage, LLC v. Francesco S. Viola, United States District Court for the Eastern District of Kentucky, Case No. 5:25-cv-70-KKC* or (ii) any other proceeding; all claims and causes of action; and any and all proceeds, products, rents, and profits of all of the foregoing, all products and proceeds of all of the foregoing; <u>provided</u>, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Agreed Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of all of the foregoing;

(b) *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, fully-perfected, non-avoidable, automatically and properly perfected junior liens on, and security interests in, all tangible and intangible pre-petition and post-petition property of the

Debtors, exclusive of the Pre-Petition Collateral, that is subject to valid, enforceable, properly perfected and non-avoidable security interests, mortgages or liens in existence as of the respective Petition Dates, if any; provided that nothing herein shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent such liens are not permitted thereunder or otherwise not entitled to priority under applicable law (including applicable contract law)[7];

(c)     *Priming Liens Senior to Certain Other Liens*.    Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, fully-perfected, non-avoidable, automatically and properly perfected priming liens on and security interests in: (i) the Pre-Petition Collateral; and (ii) any security interests, liens, and encumbrances in or on Debtors' assets held or claimed by any other party; subject to valid, enforceable, properly perfected and non-avoidable security interests, mortgages or liens of Farm Credit Mid-America and the terms of this Agreed Interim Order.

(d)     *First Lien on Land Contracts*.     Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority liens on and security interests in

---

[7] Other than with respect to the DIP Liens, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to, the Debtors, the DIP Lender, or the Pre-Petition Lender, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged senior liens and/or security interests.

all of the Debtors' right, title and interest in and to, all benefits of Debtors thereunder, and all monies due or to become due or to become due under or in connection with: (a) that certain Land Contract dated on or about January 22, 2020, as supplemented by that certain Land Contract Memorandum dated on or about February 13, 2025 and recorded in the Boyle County, Kentucky Clerk's Office in Deed Book 551, Page 605, as further amended, in each case by and between the Holdings Debtor, as buyer, and Charles M. Stafford a/k/a Michael Stafford and Donna C. Stafford, as sellers, with respect to the real property described therein as follows "being all of Tract 1, containing 90.649 acres, more or less, as shown on the plat entitled 'Stafford Estate Division' which is recorded in Plat File 2090A, Boyle County Clerk's Office, being the same property conveyed to Charles M. Stafford a/k/a Michael Stafford by deed dated January 6, 2020 and recorded in Deed Book 550, Page 760, Boyle County, Clerk's Office" and (b) that certain Land Contract dated on or about January 22, 2020, as supplemented by that certain Land Contract Memorandum dated on or about February 13, 2025 and recorded in the Boyle County, Kentucky Clerk's Office in Deed Book 551, Page 607, as further amended, in each case by and between the Holdings Debtor, as buyer, and Randall Stafford and Marnita Stafford, as sellers, with respect to the real property described therein as follows "being all of Tract 2, containing 84.814 acres, more or less, as shown on the plat entitled 'Stafford Estate Division' which is recorded in Plat File

2092A, Boyle County Clerk's Office, being the same property conveyed to Randall

Stafford by deed dated January 6, 2020 and recorded in Deed Book 550, Page 764,

Boyle County, Clerk's Office, in each case together with all other related

documents, agreements and instruments, and under all additions, amendments,

supplements or other modifications of any of the foregoing, or any proceeds of the

foregoing, now or hereinafter in effect (the foregoing collectively, the "**Land**

**Contracts**"). The Land Contracts shall not be amended, terminated or released

without the prior written consent of the DIP Lender;

(e)     All such security interests provided in this Agreed Interim

Order shall be created and perfected automatically pursuant to this Agreed Interim

Order and the DIP Loan Documents;

(f)     Notwithstanding the foregoing, the DIP Collateral shall exclude

those assets as to which the DIP Lender determines in its sole and absolute

discretion that the granting of a security interest in such assets would be prohibited

by contract or applicable law unless such prohibition is not effective under

applicable law; and

(g)     Any terms (whether capitalized or lower case) used herein that

are defined in the Uniform Commercial Code shall be construed and defined as set

forth in the Uniform Commercial Code unless otherwise defined herein; provided

that to the extent that the Uniform Commercial Code is used to define any term

used herein and if such term is defined differently in different articles of the Uniform Commercial Code, the definition of such term contained in Article 9 of the Uniform Commercial Code shall govern.

10. *No Obligation to Extend Credit*. The DIP Lender shall have no obligation to make any loan under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Agreed Interim Order, as applicable, have been satisfied in full or waived by the DIP Lender in accordance with the terms of the DIP Loan Documents.

11. *Use of Proceeds of DIP Facility*. From and after the Distillery Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Agreed Interim Order, and, in each case, in a manner consistent with the Budget and the terms and conditions in this Agreed Interim Order.

12. *Cash Collateral*. Due to the inclusion of the Debtors' cash in the Pre-Petition Collateral under the Pre-Petition Loan Documents, all of the Debtors' cash balances constitute cash collateral of the Pre-Petition Lender within the meaning of section 363(a) of the Bankruptcy Code (all such cash (including, but not limited to, the proceeds of Pre-Petition Collateral under the Pre-Petition Loan Documents) is referred to herein as "**Cash Collateral**").

*13.* *Use of Cash Collateral.*  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Loan Documents, this Agreed Interim Order, and the Budget to use the Cash Collateral of the Pre-Petition Lender in accordance with the terms of the Budget and this Agreed Interim Order.  The Debtors' right to use Cash Collateral shall terminate automatically upon the occurrence of the earlier of any of the following: (a) the maturity date set forth in the DIP Loan Documents or the earlier acceleration of the indebtedness under the DIP Facility; and (b) immediately after the DIP Lender gives notice to the Debtors of the occurrence of an Event of Default under the DIP Loan Documents. In the event an Event of Default is curable by the Debtors and is timely cured, the Debtors' right to use Cash Collateral shall resume.

*14.* *Adequate Protection.*  The Pre-Petition Lender is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507(b) of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral, for and equal in amount to any identifiable diminution or decline in the value of the Pre-Petition Collateral (the "**Adequate Protection Amounts**"), arising from: (x) the sale, lease or use by the Debtors, of the Pre-Petition Collateral; (y) the priming of the Pre-Petition Liens in the Pre-Petition Collateral by the DIP Lender pursuant to the DIP Loan Documents and this Agreed Interim Order; and (z) the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code. To provide such adequate protection, the Pre-Petition Lender is hereby granted the following:

(a)      *Pre-Petition Lender Replacement Liens*.      The Pre-Petition Lender shall receive replacement liens in the DIP Collateral to secure the Adequate Protection Amounts (the "**Replacement Liens**").

(b)      *Pre-Petition Lender 507(b) Claim*.      The Pre-Petition Lender shall receive claims against Debtors' estates in the Adequate Protection Amounts pursuant to section 507(b) of the Bankruptcy Code (the "**507(b) Claim**", and together with the Replacement Liens, the "**Adequate Protection**"); provided that other than proceeds of any claims asserted and recovered under Bankruptcy Code Section 549, the proceeds of Avoidance Actions shall not be made available to pay the 507(b) Claim which claim, to the extent unpaid, shall be treated as an administrative expense of the Debtors.

(c)      *Priority*.      Except as otherwise specifically set forth in this Agreed Interim Order, the liens and claims comprising the Adequate Protection shall be senior to all liens and claims asserted by any person or entity against Debtors and its estates, except for the DIP Liens and Superpriority Claims granted to the DIP Lender pursuant to this Agreed Interim Order and the DIP Loan Documents, and the Permitted Third Party Liens, until the Pre-Petition Secured Obligations are indefeasibly repaid in full.

15.    *Protection of DIP Lender's Rights.*

(a)    Following the giving of three (3) days' prior written notice delivered by email to the Debtors, CRO and counsel for the Debtors, with a copy to counsel for the Pre-Petition Lender, to the United States Trustee, and counsel to any committee appointed in this Bankruptcy Case (the "**Default Notice Period**"), during such time in which the Debtors shall be allowed to cure any Event of Default that is capable of being cured, the DIP Lender and Pre-Petition Lender shall be entitled to an expedited hearing on whether the automatic stay provisions of section 362 of the Bankruptcy Code should be vacated and modified to the extent necessary to permit the DIP Lender and Pre-Petition Lender to enforce all of their rights under the DIP Facility, the DIP Loan Documents, the Pre-Petition Loan Documents and this Agreed Interim Order, as applicable, and to exercise all rights and remedies thereunder and hereunder.  Notwithstanding the foregoing, during the Default Notice Period, the Debtors shall only be permitted to use the DIP Facility proceeds to fund such payments as are agreed to in writing by the DIP Lender and the Pre-Petition Lender prior to the expenditure of said funds.

16.    *Credit Bid.*  The DIP Lender and the Pre-Petition Lender, respectively, shall have the unequivocal right to credit bid under section 363(k) of the Bankruptcy Code all, or any portion, of their respective claims (including, without limitation, all accrued and unpaid interest, fees (including reasonable attorneys'

fees), and expenses) in connection with a sale of the Debtors' assets occurring pursuant to section 363 of the Bankruptcy Code, included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise, without the need for further Court order authorizing the same. Farm Credit Mid-America shall have the unequivocal right to credit bid under section 363(k) of the Bankruptcy Code all, or any portion, of Farm Credit Mid-America's claims (including, without limitation, all accrued and unpaid interest, fees (including reasonable attorneys' fees), and expenses) in connection with a sale of the LMD Real Property occurring pursuant to section 363 of the Bankruptcy Code, included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise, without the need for further Court order authorizing the same

17.    In no event shall the DIP Lender, the Pre-Petition Lender or Farm Credit Mid-America be subject to the equitable doctrine of "Marshaling" or any similar doctrine with respect to their collateral.  Further, in no event shall the "Equities of the Case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Pre-Petition Lender or Farm Credit Mid-America.

18.    *Limitation on Charging Expenses Against Collateral.*    The DIP Lender, the Pre-Petition Lender and Farm Credit Mid-America reserve all rights to seek a waiver under section 506(c) of the Bankruptcy Code in connection with the Final Order providing for, among other things, that no expenses of administration of this Bankruptcy Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, Pre-Petition Collateral, the LMD Real Property, the Pre-Petition Lender or Farm Credit Mid-America pursuant to section 506(c) of the Bankruptcy Code, or any similar principle of law, without the prior written consent of the DIP Lender, the Pre-Petition Lender and/or Farm Credit Mid-America, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, the Pre-Petition Lender or Farm Credit Mid-America. For the avoidance of doubt, such waiver under section 506(c) of the Bankruptcy Code is not granted pursuant to this Agreed Interim Order.

19.    *Perfection of DIP Liens*

(a)    The DIP Lender is hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorney, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices

of lien or similar instruments in any jurisdiction, or take possession of or control over assets, or take any other action, in each case in order to validate and perfect the liens and security interests granted to it hereunder.  Whether or not the DIP Lender, in its sole discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and date of the entry of this Agreed Interim Order.

(b)     A certified copy of this Agreed Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Agreed Interim Order for filing and recording. For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lender to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force and effect with respect to the grant of DIP Liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the DIP Lender, in accordance with the terms of the DIP Loan Documents and of this Agreed Interim Order.  In addition, all governmental (domestic and foreign), shareholder, corporate, and third-party consents have been obtained or are hereby overridden by the terms of this Agreed Interim Order.

20.    *Preservation of Rights Granted Under this Agreed Interim Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by the DIP Loan Documents and this Agreed Interim Order to the DIP Lender and the Pre-Petition Lender shall be granted or allowed while any portion of the DIP Facility, the DIP Obligations or the Pre-Petition Secured Obligations remain outstanding, and the DIP Liens and the Pre-Petition Secured Obligations shall not be: (i) subject or junior to any lien or security interest that is

avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations and Pre-Petition Secured Obligations have been indefeasibly paid in full, the Debtors shall not seek, and in addition to the other Events of Default set forth below, it shall constitute an Event of Default hereunder if the Debtors seek, or if there is entered: (i) any modifications or extensions of this Agreed Interim Order without the prior written consent of the DIP Lender and the Pre-Petition Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender or the Pre-Petition Lender; (ii) an order converting or dismissing this Bankruptcy Case; (iii) an order appointing a chapter 11 trustee in this Bankruptcy Case, without the consent of the DIP Lender and the Pre-Petition Lender; (iv) if the CRO is no longer retained by either or each of the Debtors; or (v) an order appointing an examiner with enlarged powers in this Bankruptcy Case.  In the event of the entry of any order dismissing this Bankruptcy Case under section 1112 of the Bankruptcy Code or otherwise, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Lender and the

Pre-Petition Lender, pursuant to this Agreed Interim Order and the DIP Loan Documents, but shall continue in full force and effect and maintain their priorities as provided in this Agreed Interim Order until all DIP Obligations and Pre-Petition Secured Obligations and shall have been paid and satisfied in full (and that such Superpriority Claims, DIP Liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

          (c)     If any or all of the provisions of this Agreed Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender, as of the effective date of such reversal, modification, vacation or stay, or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacation or stay, any DIP Obligations incurred by the Debtors to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Agreed Interim Order and the DIP Loan Documents, and the DIP Lender shall be entitled to all the rights,

remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Agreed Interim Order and pursuant to the DIP Loan Documents with respect to the DIP Obligations.

(d)     Except as expressly provided in this Agreed Interim Order or in the DIP Loan Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender and the Pre-Petition Lender granted by the provisions of this Agreed Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by any of: (i) the entry of an order converting this Bankruptcy Case to a case under chapter 7 or dismissing this Bankruptcy Case; (ii) the entry of an order approving the sale of any DIP Collateral or Pre-Petition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents and hereunder); or (iii) the entry of an order confirming a plan of reorganization in this Bankruptcy Case.  The terms and provisions of this Agreed Interim Order and the DIP Loan Documents shall continue in this Bankruptcy Case, in any successor case(s), or in any superseding chapter 7 case(s) under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender and the Pre-Petition Lender granted by the provisions of this Agreed Interim Order and the DIP Loan Documents shall continue in full force and effect until the DIP Obligations and the Pre-Petition Secured Obligations are indefeasibly

paid in full unless otherwise consented to in writing in advance by the DIP Lender and the Pre-Petition Lender in its sole discretion.

21.     *Operations Pursuant to Approved Budget*.

(a)     During the term of this Agreed Interim Order, the CRO shall operate the businesses of the Debtors pursuant to the Budget, which is hereby approved by this Court to the extent applicable to the period of this Agreed Interim Order.   As used herein, "**Budget**" means, (i) the initial cash flow budget attached to the Motion, setting forth, (x) projected cash receipts, (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under this Bankruptcy Case, capital expenditures, asset sales, and estimated fees and expenses of the DIP Lender and any other fees and expenses relating to the DIP Facility) and (z) the unused availability under the DIP Facility (if any), and (ii) such updated "**rolling**" 13-week cash flow budgets, provided bi-weekly to supplement and replace the Budget then in effect.

(b)     Commencing with the first Wednesday after the Distillery Petition Date and on every Wednesday thereafter (not later than 5:00 p.m. ET on each Wednesday) during the term of this Agreed Interim Order, the Debtors shall provide to the DIP Lender and the Pre-Petition Lender, in a form acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, and Farm Credit Mid-America, but in the case of Farm Credit Mid-America only with respect to the

Holdings Debtor, a Budget variance report/reconciliation report certified by the CRO, setting forth: (i) the actual cash receipts, expenditures and disbursements for the trailing four weeks then ending; and (ii) the variance in dollar amounts of the actual expenditures, and disbursements for such trailing four-week period from those budgeted amounts for the corresponding period reflected in the Budget (each such report, a "**Variance Report**").

(c)     The Debtors shall, commencing on the first Wednesday from the Distillery Petition Date and on each Wednesday thereafter, maintain aggregate expenditures no greater than 110% of the aggregate amount projected by the Budget to be expended during such period (the "**Allowed Variance**"); provided, however, the Allowed Variance shall not apply to professional fees in the Budget, which shall not exceed the line item budgeted for amounts to pay for professional fees.  The Debtors shall, commencing on the first Wednesday from the Distillery Petition Date and each Wednesday thereafter (not later than 5:00 p.m. ET on each Wednesday), provide financial and performance reports to the DIP Lender, the Pre-Petition Lender and Farm Credit Mid-America, but in the case of Farm Credit Mid-America only with respect to the Holdings Debtor, in a form acceptable to the DIP Lender, the Pre-Petition Lender and Farm Credit Mid-America, but in the case of Farm Credit Mid-America only with respect to the Holdings Debtor, in their sole discretion. The DIP Lender and the Pre-Petition Lender shall review weekly

payments at the time of each weekly DIP Facility draw. In the event the aggregate payments exceed the Allowed Variance, any payments outside the Budget must be specifically approved by the DIP Lender and the Pre-Petition Lender

     22.    *Payment of Professional Fees and Administrative Fees.*

     (a)    With respect to the Chief Restructuring Officer of the Debtors ("**CRO**") and counsel retained in this Bankruptcy Case for the Debtors (in the case of the Distillery Debtor, Stevenson & Bullock, P.L.C., and in the case of the Holdings Debtor, Robert N. Bassel) ("**Debtor Counsel**" and together with the CRO, the "**Debtor Professionals**"), and notwithstanding anything to the contrary herein, the Debtors shall be authorized, subject to the terms of the Budget, to fund on a weekly basis from the proceeds of the DIP Facility, an amount equal to the professional fees and expenses specified for each Debtor Professional for that week in the Budget (the "**Weekly Professional Fees Funding**"). The Weekly Professional Fees Funding for each Debtor Professional shall be deposited into an interest-bearing IOLTA or trust account maintained by such Debtor Professional (each, a "**Professional Fee Account**"). The Weekly Professional Fees Funding for each Debtor Professional shall be held in trust solely for payment of all fees and out-of-pocket expenses for such Debtor Professional in accordance with the Budget (the "**Debtor Professional Fees**") allowed by this Court.

(b)     The DIP Lender and Pre-Petition Lender shall maintain a valid, enforceable, non-avoidable, fully, automatically, and properly perfected first priority security interest in  any amounts funded as part of the Weekly Professional Fees Funding until such funds are paid to the respective Debtor Professional pursuant to an order by this Court approving such Debtor Professional's reasonable fees and expenses, as applicable. To the extent any amounts of the Weekly Professional Fees Funding remain unused after payment of all allowed Debtor Professional Fees (the "**Unused Professional Fee Funds**"), such Unused Professional Fee Funds shall be promptly paid to the DIP Lender for the benefit of the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Pre-Petition Lender for the benefit of the Pre-Petition Lender.

(c)     Neither the DIP Lender nor the Pre-Petition Lender shall be responsible for the payment or reimbursement of the Debtor Professional Fees or any fees or disbursements of any other professionals incurred in connection with this Bankruptcy Case or any successor case under any chapter of the Bankruptcy Code. Nothing in this Agreed Interim Order or otherwise shall be construed to obligate the DIP Lender or the Pre-Petition Lender in any way, to pay compensation to, or to reimburse expenses of, the Debtor Professional Fees or any fees or disbursements of any other professionals incurred in connection with this

Bankruptcy Case or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     For the avoidance of doubt, the DIP Lender and the Pre-Petition Lender shall not be deemed to have granted any "carve-out" for the Debtor Professional Fees and all funding for such Debtor Professional Fees shall be in accordance with this Agreed Interim Order and the Budget.

(e)     All amounts allocated in the Budget for payment of fees required to be paid to the Clerk of this Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) (which shall be paid in full) (the "**Court and UST Fees**") shall be maintained in a segregated DIP account to be opened and maintained by each the Holdings Debtor and the Distillery Debtor within seven (7) business days of entry of this Agreed Interim Order (each, an "**Administrative Fees Account**"). The funds in each Administrative Fees Account shall be used solely to pay this Court and UST Fees in accordance with the Budget and this Agreed Interim Order.

(f)     For purposes of this Agreed Interim Order, the "**Trigger Notice**" shall mean written notice delivered by email by the DIP Lender and the Pre-Petition Lender to counsel for the Debtors and the Office of the U.S. Trustee which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, DIP Loan Documents

or this Agreed Interim Order and acceleration of the DIP Obligations under the DIP Facility, stating that the Trigger Notice Cap (as defined herein) has been invoked. Upon issuance of a Trigger Notice, amounts not exceeding $20,000 (the "**Trigger Notice Cap**") may be used by the Debtors from the proceeds of the DIP Facility, subject to the terms of this Agreed Interim Order and the Budget, to pay any allowed Debtor Professional Fees incurred following the issuance of the Trigger Notice. The Debtors shall deposit and hold such amounts in a segregated account maintained by each the Holdings Debtor and the Distillery Debtor (each, a "**Trigger Notice Reserve**"), which each such account shall be subject to a valid, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first priority security interest of the DIP Lender and the Pre-Petition Lender, in trust to pay accrued, unpaid and allowed Debtor Professional Fees benefiting from the Trigger Notice Cap (subject at all times to the Budget). All funds in the Trigger Notice Reserve shall be used first to pay the unpaid and allowed Debtor Professional Fees benefiting from the Trigger Notice Cap, and then, to the extent the Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender for the benefit of the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Pre-Petition Lender for the benefit of the Pre-Petition Lender.

(g)     So long as a Trigger Notice has not been delivered, the Debtors are permitted to fund, subject to and in accordance with the Budget and this Agreed Interim Order, the Weekly Professional Fees Funding.

(h)     In the event a Trigger Notice has been delivered, the DIP Lender and the Pre-Petition Lender consent to (i) each Debtor Professional using the amounts in each Professional Fees Account to pay accrued, unpaid and allowed Debtor Professional Fees incurred prior to the Trigger Notice and (ii) the Debtors using the Trigger Notice Reserve to pay accrued, unpaid and allowed Debtor Professional Fees benefiting from the Trigger Notice Cap.

(i)     For the avoidance of doubt, (1) the applicable dollar limitations on fees and expenses for the Debtor Professionals in the Budget shall be reduced by the amount of any Debtor Professional Fees incurred, awarded or paid (such fees and expenses may not exceed the cumulative amount specified for such professional in the Budget), and (2) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above Further, notwithstanding anything to the contrary in this Agreed Interim Order, the Final Order or in the DIP Loan Documents in no event shall the DIP Lender be required to fund any amounts in excess of (x) the Interim Draw prior to entry of the Final Order;  (y) the Final Draw upon entry of the Final Order; or (z) the DIP Facility after entry of the Final Order.

23.     *Limitation on Use of Proceeds of DIP Facility and DIP Collateral*.

(a)     Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, the DIP Collateral, or the Cash Collateral may be used directly or indirectly, in this Bankruptcy Case or any other proceeding of any kind, or in any jurisdiction, to: (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Facility or the DIP Loan Documents or the liens or claims granted thereunder or under this Agreed Interim Order and the Final Order; (b) investigate, assert or prosecute any claims and defenses or causes of action against the DIP Lender or its respective agents, affiliates, representatives, attorneys or advisors; (c) prevent the DIP Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Loan Documents or this Agreed Interim Order and the Final Order; (d) seek to modify any of the rights granted to the DIP Lender hereunder, the Final Order or under the DIP Loan Documents in this Bankruptcy Case, without the DIP Lender's prior written consent; (e) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the Pre-Petition Loan Documents or the liens or claims granted thereunder; (f) investigate, assert or prosecute any claims and defenses or causes of action against SummitBridge, in its capacity as Pre-Petition Lender, or its respective agents, affiliates, representatives, attorneys or advisors; (g) prevent the

Pre-Petition Lender's assertion, enforcement or realization on the Pre-Petition Collateral in accordance with the Pre-Petition Loan Documents or this Agreed Interim Order and the Final Order; (h) seek to modify any of the rights granted to the Pre-Petition Lender hereunder , the Final Order or under the Pre-Petition Loan Documents, in each of the foregoing case, without the Pre-Petition Lender's prior written consent; or (i) pay any amount on account of any claims arising prior to the respective Petition Dates unless such payments are (x) approved by an order of this Court and (y) permitted under the DIP Loan Documents and the Pre-Petition Loan Documents.

(b)     Except as set forth herein, no portion of (i) the DIP Facility proceeds, (ii) proceeds of any of the DIP Collateral (as defined herein), (iii) the Cash Collateral or (iv) other property or assets of the Debtors may be used for the payment of the fees or reimbursement of expenses of any person that were incurred in (x) challenging  any of the security interests, liens or claims of SummitBridge, in either capacity as the DIP Lender or the Pre-Petition Lender, or (y) investigating, initiating, or prosecuting any claim or action against SummitBridge, in either capacity as the DIP Lender or the Pre-Petition Lender, or any of their advisors, agents and sub-agents, including but not limited to any claim under chapter 5 of the Bankruptcy Code, any claim under state or foreign law, the commencement or participation in formal discovery proceedings in anticipation of any such claim or

action, or the threat or assertion of any other lender liability or other claim or cause of action against the DIP Lender or the Pre-Petition Lender.

24. *Events of Default.* The occurrence or existence of the following events shall constitute an Event of Default hereunder, which, in addition to any and all defaults and Events of Default provided in the DIP Loan Documents, which are explicitly incorporated by reference in this Agreed Interim Order, shall collectively be referred to herein as an "**Event of Default**":

(a) The Debtors do not pay on the due date any amount payable pursuant to any of the DIP Loan Documents or this Agreed Interim Order at the place and in the amount required to be paid.

(b) The Debtors do not comply with any provision of the DIP Loan Documents or this Agreed Interim Order (other than those referred to in the foregoing subsection), including, without limitation, compliance with any Milestone (as defined herein).

(c) Any representation, warranty or statement made or given or deemed to be made or given by the Debtors in the DIP Loan Documents, this Agreed Interim Order or any other document delivered by or on behalf of the Debtors under or in connection with any of the DIP Loan Documents is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

(d)     Any post-petition indebtedness of the Debtors to any party is not paid when due.

(e)     Any post-petition indebtedness of the Debtors to any party is declared to be or otherwise becomes due and payable before its specified maturity.

(f)     Any commitment for any indebtedness of the Debtors is cancelled or suspended by a creditor of the Debtors as a result of an event of default (however described).

(g)     Any creditor of the Debtors becomes entitled to declare any indebtedness of the Debtors due and payable before its specified maturity as a result of an event of default (however described) and receives relief from stay to exercise its remedies.

(h)     It is or becomes unlawful for Debtors to perform any of their obligations under the DIP Loan Documents or the Pre-Petition Loan Documents.

(i)     The Debtors repudiate any of the DIP Loan Documents or the Pre-Petition Loan Documents or evidence an intention to repudiate any of the DIP Loan Documents or the Pre-Petition Loan Documents.

(j)     Any DIP Loan Document or Pre-Petition Loan Document is not (or is claimed by the Debtors not to be) in full force and effect.

(k)     The holder of any lien on any of the assets of the Debtors receives relief from automatic stay to commence or attempt to commence any enforcement or remedy with respect to any such assets.

(l)     The CRO is no longer retained by either or each of the Debtors.

(m)     This Court shall enter any order(s) (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying this Agreed Interim Order or any other order with respect to this Bankruptcy Case affecting in any material respect the DIP Loan Documents or the Pre-Petition Loan Documents, (ii) appointing a Chapter 11 trustee or an examiner in the Case with enlarged powers relating to the operation of the business of the Debtors pursuant to section 1104 of the Bankruptcy Code, (iii) dismissing this Bankruptcy Case or converting this Bankruptcy Case to a case(s) under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay for a lien on the assets of the Debtors to permit any foreclosure upon any of the DIP Collateral or the Pre-Petition Collateral.

(n)     Any order(s) is entered by this Court approving a motion filed in this Bankruptcy Case approving any superpriority claims in this Bankruptcy Case which are *pari passu* with or senior to the claims of the DIP Lender or the Pre-Petition Lender against the Debtors unless after giving effect to the transactions contemplated by such motion, all of the DIP Obligations (as defined in

the DIP Security Agreement) and the Pre-Petition Secured Obligations shall be either (i) senior in all respects, or (ii) indefeasibly paid in full in cash in their sole discretion.

(o) Any motion shall be filed by the Debtors in this Bankruptcy Case (i) seeking to obtain additional financing under section 364 of the Bankruptcy Code and/or to use Cash Collateral of the DIP Lender and/or the Pre-Petition Lender under section 363(c) of the Bankruptcy Code without the consent of the DIP Lender and the Pre-Petition Lender that is not subordinate to the rights and remedies of the DIP Lender and the Pre-Petition Lender hereunder or, in the alternative, does not provide for the indefeasible and immediate repayment of the DIP Obligations and the Pre-Petition Secured Obligations in cash at the closing of such new financing, (ii) subject to the entry of the Final Order, to recover from any portions of the DIP Collateral or the Pre-Petition Collateral any costs or expenses of preserving or disposing of such DIP Collateral or Pre-Petition Collateral under section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to rights and remedies of the DIP Lender or the Pre-Petition Lender hereunder or under any of the other DIP Loan Documents, the Pre-Petition Loan Documents or this Agreed Interim Order or any Final Order entered in this Bankruptcy Case. For the avoidance of doubt, the Debtors may seek financing to pay estate expenses, the proceeds of which may be used by the Debtors, subject to

further orders of this Court, to pay such expenses notwithstanding the rights and remedies of the DIP Lender and the Pre-Petition Lender, and offer liens and priority claims to a financier provided that the rights and remedies of such financier shall be subordinate in all respects to the DIP Obligations and the Pre-Petition Secured Obligations and the liens and claims associated therewith pursuant to loan documents and a subordination agreement acceptable to the DIP Lender and the Pre-Petition Lender.

(p)     This Court shall not have entered the Final Order by December 15, 2025.

(q)     The Debtors fail to be in compliance with any item on the Budget for any applicable period, subject to the Allowed Variance.

(r)     The Debtors materially fail to comply with any performance and reporting covenants contained in this Agreed Interim Order, the DIP Loan Documents, the Pre-Petition Loan Documents, or breach any provisions of this Agreed Interim Order or the DIP Loan Documents.

(s)     Any material breach of (x) the Debtors' governance documents or (y) the management or operation provisions in the CRO Agreement.

25.     *Termination Date*.  All DIP Obligations shall be immediately due and payable and all commitments to extend credit under the DIP Facility shall terminate the earlier of: (i) three (3) days after the date upon which the DIP Lender

or Pre-Petition Lender provides notice of an Event of Default or (ii) the date that is one hundred twenty (120) days after the entry of this Agreed Interim Order (the "**Termination Date**"), unless the Termination Date is extended by written stipulation of the DIP Lender, the Pre-Petition Lender, FCMA, FCLSC and the Debtors or further order of this Court.[8] In the event an Event of Default is curable by the Debtors and is timely cured, the DIP obligations shall no longer be immediately due and payable and all commitments to extend credit under the DIP Facility shall resume.

26. *Remedies*.

(a) Upon the occurrence and continuation of a monetary Event of Default or an uncured non-monetary Event of Default, following the DIP Lender and the Pre-Petition Lender providing three (3) days' written notice, which shall be provided via email to the Debtors, CRO, counsel for the Debtors, counsel for FCMA and counsel for FCLSC, with a copy to counsel for the Pre-Petition Lender, to the United States Trustee, and counsel to any committee appointed in this Bankruptcy Case, subject to compliance with this Agreed Interim Order, all of the DIP Obligations shall become immediately due and payable, without any further demand, notice, further order of this Court or legal process of any kind, and the DIP Lender and Pre-Petition Lender shall file a motion with this Court seeking

---

[8] For the avoidance of doubt, upon a non-monetary Event of Default, the Debtors shall be given three (3) days' prior written notice to cure such Event of Default.

emergency relief for further order of this Court modifying the automatic stay in this Bankruptcy Case to permit the DIP Lender and the Pre-Petition Lender to exercise any and all rights and remedies against Debtors and/or the DIP Collateral and/or the Pre-Petition Collateral as provided herein, in the DIP Loan Documents, the Uniform Commercial Code, the Pre-Petition Loan Documents and other applicable law, or otherwise, including their rights to take the following actions (all of which rights and remedies may be exercised without further notice to or consent by the Debtors):

(i) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral derived from the proceeds of the DIP Collateral or the Pre-Petition Collateral;

(ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the DIP Collateral or the Pre-Petition Collateral may be located and take possession of the DIP Collateral and the Pre-Petition Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral or the Pre-Petition Collateral;

(iii) require the Debtors to provide access to the DIP Lender or the Pre-Petition Lender to any part or all of the DIP Collateral or the Pre-Petition Collateral at any place and time designated by the DIP Lender or the Pre-Petition Lender;

(iv)     remove any or all of the DIP Collateral or the Pre-Petition Collateral to which the DIP Lender and the Pre-Petition Lender have a first priority lien from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose;

(v)     collect, foreclose, receive, appropriate, setoff or realize upon any and all DIP Collateral or the Pre-Petition Collateral, subject to the priority scheme for any liens on such DIP Collateral or Pre-Petition Collateral;

(vi)     transfer any DIP Collateral or the Pre-Petition Collateral to which the DIP Lender or the Pre-Petition Lender has a first priority lien into the name of the DIP Lender or the Pre-Petition Lender or that of their nominee(s);

(vii)     elect to become the buyer under the Land Contracts and entitled to enforce and exercise any and all rights and remedies therein, and to receive the benefit thereof in accordance with the terms of the Land Contracts, as amended hereby, and applicable law; and in accordance therewith the Debtors hereby grant unto the DIP Lender and the Pre-Petition Lender their power of attorney, which shall be coupled with an interest, for the purposes of filing or recording any instruments, documents or agreements necessary or desirable to confirm, perfect or otherwise effectuate the purposes hereof in the applicable land records or otherwise;

(viii)  sell, lease, transfer, assign, deliver or otherwise dispose of any of the DIP Collateral or the Pre-Petition Collateral at public or private sale at such prices or terms as the DIP Lender or the Pre-Petition Lender may deem reasonable, subject to the applicable state law rights of third parties, if any, that have valid, enforceable, properly perfected and non-avoidable liens and security interests in such collateral, for cash, upon credit or for future delivery, with the DIP Lender or the Pre-Petition Lender, subject to the applicable state law rights of third parties, if any, that have valid, enforceable, properly perfected and non-avoidable liens and security interests in such collateral, having the right to purchase the whole or any part of the DIP Collateral or the Pre-Petition Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of the Debtors, which right or equity of redemption is hereby expressly waived and released by the Debtors;

(ix)  enforce the rights of the Debtors against any account debtors, secondary obligor or other obligor in respect of any accounts, including, without limitation: (a) to notify any account debtors, secondary obligor or other obligor in respect thereof that the accounts have been assigned to the DIP Lender or the Pre-Petition Lender and that the DIP Lender or the Pre-Petition Lender have a security interest therein; (b) to direct any account debtors, secondary obligor or other obligor to make payment of accounts directly to the DIP Lender or the

Pre-Petition Lender; (c) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any accounts or other obligations included in the DIP Collateral or the Pre-Petition Collateral and thereby discharge or release the account debtors, secondary obligor or other obligor in respect thereof without affecting any of the DIP Obligations or the Pre-Petition Secured Obligations; or (d) demand, collect or enforce payment of any accounts or other related obligations, but without any duty to do so, and the DIP Lender or the Pre-Petition Lender shall not be liable for any failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto;

(x)    file any action or proceeding which the DIP Lender or the Pre-Petition Lender may deem necessary or appropriate to protect and preserve the right, title and interest of the DIP Lender and the Pre-Petition Lender in the DIP Collateral and the Pre-Petition Collateral;

(xi)    apply all sums received or collected from or on account of DIP Collateral or the Pre-Petition Collateral, including the proceeds of any sales thereof, to the payment of the costs and expenses incurred in preserving and enforcing rights of the DIP Lender and the Pre-Petition Lender, including but not limited to reasonable attorneys' fees and legal expenses, and DIP Obligations and Pre-Petition Secured Obligations secured by the DIP Collateral and Pre-Petition

Collateral, respectively, in such order and manner as the DIP Lender and the Pre-Petition Lender in their sole discretion determine; and

(xii)    exercise any other rights or remedies available to the DIP Lender and the Pre-Petition Lender under this Agreed Interim Order, the Uniform Commercial Code, the DIP Loan Documents, the Pre-Petition Loan Documents, the Bankruptcy Code, applicable law, equity or otherwise.

(b)    All rights, remedies and powers granted to the DIP Lender and the Pre-Petition Lender hereunder, in the DIP Loan Documents, the Pre-Petition Loan Documents, the Uniform Commercial Code or other applicable law, or otherwise, are cumulative, not exclusive, and enforceable in the discretion of the DIP Lender or the Pre-Petition Lender, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by the Debtors of the DIP Loan Documents or the Pre-Petition Loan Documents.

(c)    Debtors shall pay to the DIP Lender and the Pre-Petition Lender without demand any deficiency after any DIP Collateral or Pre-Petition Collateral has been disposed of and the proceeds thereof have been applied to the DIP Obligations and the Pre-Petition Secured Obligations, and the DIP Lender and the Pre-Petition Lender shall account to Debtors for any surplus remaining thereafter and shall pay such surplus to Debtors.

(d)     If notice of disposition of the DIP Collateral or the Pre-Petition Collateral is required by law, ten (10) days prior notice by the DIP Lender or the Pre-Petition Lender to the CRO and the Debtors designating the time and place of any public sale or the time after which any private sale or other intended disposition of the DIP Collateral or the Pre-Petition Collateral is to be made, shall be deemed to be reasonable and commercially reasonable notice thereof and, subject to applicable law, the Debtors waive any other notice.  To the extent that applicable law imposes duties on the DIP Lender or the Pre-Petition Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), the Debtors acknowledge and agree that it is not commercially unreasonable for the DIP Lender or the Pre-Petition Lender: (a) to fail to incur expenses reasonably deemed significant by the DIP Lender or the Pre-Petition Lender to prepare DIP Collateral or the Pre-Petition Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (b) to fail to obtain third party consents for access to the DIP Collateral or the Pre-Petition Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of the DIP Collateral  or the Pre-Petition Collateral to be collected or disposed of; (c) to fail to exercise collection remedies against account debtors, secondary

obligors or other persons obligated on the DIP Collateral or the Pre-Petition Collateral or to remove liens or encumbrances on or any adverse claims against the DIP Collateral or the Pre-Petition Collateral; (d) to exercise collection remedies against account debtors and other persons obligated on the DIP Collateral or the Pre-Petition Collateral directly or through the use of collection agencies and other collection specialists; (e) to advertise dispositions of the DIP Collateral or the Pre-Petition Collateral through publications or media of general circulation, whether or not the DIP Collateral or the Pre-Petition Collateral is of a specialized nature; (f) to contact other persons, whether or not in the same business as the Debtors, for expressions of interest in acquiring all or any portion of the DIP Collateral or the Pre-Petition Collateral; (g) to hire one or more professional auctioneers to assist in the disposition of the DIP Collateral or the Pre-Petition Collateral, whether or not the collateral is of a specialized nature; (h) to dispose of the DIP Collateral or the Pre-Petition Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the DIP Collateral or the Pre-Petition Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (i) to dispose of assets in wholesale rather than retail markets; (j) to disclaim disposition warranties; (k) to purchase insurance or credit enhancements to insure the DIP Lender and the Pre-Petition Lender against risks of loss, collection or disposition of DIP Collateral or the Pre-Petition

Collateral or to provide to the DIP Lender or the Pre-Petition Lender a guaranteed return from the collection or disposition of the DIP Collateral or the Pre-Petition Collateral; or (l) to the extent deemed appropriate by the DIP Lender or the Pre-Petition Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the DIP Lender and the Pre-Petition Lender in the collection or disposition of any of the DIP Collateral or the Pre-Petition Collateral. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to the Debtors or to impose any duties on the DIP Lender or the Pre-Petition Lender that would not have been granted or imposed by the DIP Loan Documents, the Pre-Petition Loan Documents, this Agreed Interim Order, or by applicable law in the absence of this Section.

(e) Farm Credit Mid-America explicitly reserves all of its rights and remedies under the Bankruptcy Code, applicable law, and its loan documents with the Holdings Debtor. To the extent that Farm Credit Mid-America's rights and remedies are not explicitly set forth in this paragraph 26 or otherwise in this Agreed Interim Order, none of Farm Credit Mid-America's rights and remedies are waived or abrogated.

27. *Collateral Reporting, Appraisals and Field Exam.* During the existence of an Event of Default, and without regarding to any notice period

provided herein or in the DIP Loan Documents or the Pre-Petition Loan Documents, the DIP Lender, the Pre-Petition Lender and Farm Credit Mid-America, but in the case of Farm Credit Mid-America only with respect to the Holdings Debtor, shall be permitted to conduct field examinations and obtain appraisals with respect to the DIP Collateral or the Pre-Petition Collateral as reasonably requested by the DIP Lender, the Pre-Petition Lender or Farm Credit Mid-America.

28.     *Case Milestones*.  As a condition to having access to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to the following milestones (collectively, the "**Milestones**"), which may only be modified by the written consent of the DIP Lender in its sole discretion:

(a)     no later than one (1) business day after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, to seek joint administration of this Bankruptcy Case;

(b)     no later than three (3) business days after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, to retain the CRO;

(c)     no later than five (5) business days after the Debtors retain the CRO, commence an investigation regarding all prepetition amounts transferred, distributed or repaid by the Debtors to VH and Versatrans (the "**Investigation**")

and, following conclusion of the Investigation, make immediate demand (the "**Demand**") upon VH and Versatrans, as applicable, for the immediate return of all avoidable and recoverable transfers (the "**Transfers**") by and between the Debtors and VH and Versatrans, respectively;

(d)    within five (5) business days of the Demand, if the funds (the "**Funds**") associated with the Transfers are not repaid to the Debtors, commence actions (the "**Chapter 5 Litigation**") in this Court for the recovery of such Funds from VH and Versatrans, as applicable;

(e)    within seven (7) business days after the Distillery Petition Date, file a motion (the "**Sale Motion**"), in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, and Farm Credit Mid-America to sell all or substantially all of their assets and business operations pursuant to the Bid Procedures (as defined herein) which provides for the indefeasible and final payment in full, in cash, of the obligations under the DIP Facility and the Pre-Petition Secured Obligations and all other obligations owing to the DIP Lender and the Pre-Petition Lender, whether arising prior to, on, or after the respective Petition Dates, upon the closing of such sale) with the closing of such sale to occur no later than 120 days after the Distillery Petition Date (inclusive of such payment in full requirement, the "**Sale**");

(f) within seven (7) business days after the Distillery Petition Date, file a motion, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, to approve bidding procedures for the Sale (the "**Bid Procedures**");

(g) no later than five (5) business days after the Distillery Petition Date, obtain entry of this Agreed Interim Order;

(h) no later than two (2) business days after the filing of the Sale Motion, distribute necessary materials with respect to the Sale to potential purchasers of the assets and business operations of the Debtors, which materials will be in a form reasonably acceptable to the DIP Lender and the Pre-Petition Lender, and to continue to distribute such materials, as appropriate, until the applicable deadline set forth in the Bid Procedures;

(i) no later than 35 days after the Distillery Petition Date, obtain an order of this Court, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, approving the Bid Procedures;

(j) no later than 35 days after the Distillery Petition Date, obtain an order of this Court, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, approving the Debtors' employment of the CRO;

(k)    no later than 35 days after the Distillery Petition Date, obtain entry of the Final Order;

(l)    no later than 90 days after the Distillery Petition Date, conclude the auction of the assets and business operations of the Debtors pursuant to the Bid Procedures;

(m)    no later than 95 days after the Distillery Petition Date, obtain entry of an order of this Court, in form and substance acceptable to the DIP Lender and the Pre-Petition Lender, in their sole discretion, authorizing the unconditional sale of substantially all of the assets of the Debtors, including the DIP Collateral and the Pre-Petition Collateral, in an amount that infeasibly pays in full, in cash, the DIP Obligations and the Pre-Petition Secured Obligations; and

(n)    no later than 120 days after the Distillery Petition Date, close the Sale of the assets and business operations of the Debtors pursuant to the Bid Procedures and indefeasibly and finally pay the obligations under the DIP Facility and all other obligations to the DIP Lender and the Pre-Petition Lender, whether arising prior to, on, or after the respective Petition Dates, in full, in cash, at the closing of the Sale.

29.    *DIP Lender's Fees and Expenses*.    Upon the Termination Date, all reasonable and documented pre-petition and post-petition fees and out-of-pocket expenses of the DIP Lender in connection with the DIP Facility and this

Bankruptcy Case, including without limitation, the fees, costs and out-of-pocket expenses of the DIP Lender's professionals, shall be part of the DIP Obligations. The DIP Lender shall have the right to charge the DIP Facility for any such fees and costs (whether such costs were incurred prior to the respective Petition Dates or after the respective Petition Dates). To the extent the DIP Lender charges the DIP Facility for such fees and costs, they will become part of the DIP Facility.

30. *Payments Held in Trust*. Except as expressly permitted in this Agreed Interim Order or in the DIP Loan Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any proceeds of the DIP Collateral or the Pre-Petition Collateral or receives any other payment with respect thereto from any other source prior to indefeasible satisfaction of all DIP Obligations and the Pre-Petition Secured Obligations and termination of the obligations owing to the DIP Lender and the Pre-Petition Lender in accordance with the DIP Loan Documents, the Pre-Petition Loan Documents or this Agreed Interim Order, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of the DIP Collateral or the Pre-Petition Collateral in trust for the benefit of the DIP Lender or the Pre-Petition Lender and shall immediately turn over such proceeds to the DIP Lender or the Pre-Petition Lender, or as otherwise instructed by this Court.

31. *No Lender Liability*.  In determining to make any loan (whether under the DIP Loan Documents or otherwise) or to permit the use of Cash Collateral, SummitBridge, in either capacity as the DIP Lender or the Pre-Petition Lender, shall not owe any fiduciary duty to the CRO or Debtors, their respective creditors, shareholders, or estates. Furthermore, nothing in this Agreed Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon SummitBridge, in either capacity as the DIP Lender or the Pre-Petition Lender, of any liability for any claims arising from the prepetition or post-petition activities of the CRO, on behalf of the Debtors, or the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

32. *No Third-Party Beneficiaries*.  This Agreed Interim Order does not create any rights for the benefit of any third party, creditor, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

33. *Amendments to DIP Loan Documents*.  The Debtors and the DIP Lender may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as Debtors and the DIP Lender agree and no further approval of this Court shall be required for any non-substantive amendment, waiver, consent, or other modification to and under the DIP Loan Documents (and any fees paid in connection therewith) that

does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility, or (iii) change any Event of Default (as defined in the DIP Loan Documents), add any covenants, or amend the covenants in each case to be materially more restrictive; provided, however, notice of any such amendment or other modification shall be provided by the Debtors to the Office of the United States Trustee and any committee appointed in this Bankruptcy Case (if any) five (5) days in advance of its effectiveness, to the extent reasonably practicable, with an opportunity for parties-in-interest to object. No consent to any such amendment, waiver, consent, or modification set forth in this paragraph shall be implied by any action, inaction, or acquiescence of the DIP Lender. After obtaining the DIP Lender's prior written consent, the CRO is authorized and empowered, without further notice and hearing or approval of this Court so long as such amendment, or modification is not of the type set forth in clauses (i)–(iii) above, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof.

34. *Retention of Jurisdiction*. This Court has and will retain jurisdiction to enforce this Agreed Interim Order according to its terms.

35.     *Order Governs*.   In the event of any inconsistency between the provisions of this Agreed Interim Order and the DIP Loan Documents, the provisions of this Agreed Interim Order shall govern.

36.     *Binding Effect; Successors and Assigns*.   Immediately upon entry of this Agreed Interim Order by this Court, the DIP Loan Documents and the provisions of this Agreed Interim Order, including all findings herein, shall be valid and binding upon all parties in interest in this Bankruptcy Case, including, without limitation, the DIP Lender, the Pre-Petition Lender, and Debtors and their respective successors and assigns (including any chapter 7 trustee upon conversion or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors) and shall inure to the benefit of the DIP Lender, the Pre-Petition Lender and Debtors and their respective successors, and assigns; provided, however, that neither the DIP Lender nor the Pre-Petition Lender shall have any obligation to permit the use of the DIP Collateral or Pre-Petition Collateral (including Cash Collateral) or extend any financing to Debtors and any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.   In determining to extend the DIP Facility or in exercising any rights or remedies as and when permitted pursuant to this Agreed Interim Order, the DIP Loan Documents, or the Pre-Petition Loan Documents, the DIP Lender and the Pre-Petition Lender shall not be deemed to be in control of the operations of or participating in the

management of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

37. *Effect of Stipulations on Debtors and Successors.*  The stipulations and admissions contained in this Agreed Interim Order shall be binding upon the Debtors and their subsidiaries and any of their respective successors (including, without limitation, any chapter 7 trustee upon conversion or chapter 11 trustee appointed or elected for Debtors) in all circumstances.

38. This Agreed Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Agreed Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Agreed Interim Order.

39. *Farm Credit Mid-America Adequate Protection.*  Farm Credit Mid-America asserts a mortgage lien in and to certain Pre-Petition Collateral, including the LMD Real Property, to secure the Farm Credit Mid-America

Obligations. As adequate protection, Farm Credit Mid-America is granted (i) a replacement lien in the LMD Real Property and Cash Collateral and proceeds thereof, to the extent of any interest in such collateral as of the respective Petition Dates, with the same validity, priority and extent as its purported lien in the LMD Real Property and Cash Collateral and the proceeds thereof as of the respective Petition Dates; and (ii) monthly payments in the amount of $17,711, subject to a full reservation of rights and subject to disgorgement, setoff or other appropriate remedy in the event it is ultimately determined that the asserted Farm Credit Mortgage and related liens are unenforceable or not validly perfected. Notwithstanding anything to the contrary contained herein, the DIP Liens shall not prime any of Farm-Credit Mid-America's valid, enforceable, properly perfected and non-avoidable liens on the Debtors' assets as of the respective Petition Dates, including but not limited to, the first priority Farm Credit Mortgage on the LMD Real Property. Further, Farm Credit Mid-America reserves the right to assert payment from the Debtors for its attorneys' fees, costs, principal, default rate interest and all other amounts owed under the Farm Credit Mid-America Loan Documents and all parties' rights to object to such relief are reserved.

40. *Farm Credit Leasing Services Corporation Adequate Protection*. FCLSC has filed a prepetition Article 9 financing statement asserting an interest in certain collateral of the Debtors identified as an 11,000-barrel rickhouse located in

Danville, Kentucky (the "**Rickhouse**"). To the extent that FCLSC's interest in the Rickhouse is deemed a security interest and not a true lease, as adequate protection, FCLSC is granted (i) a replacement lien in the Rickhouse and proceeds thereof with the same validity, priority and extent as its purported lien in the Rickhouse and the proceeds thereof as of the respective Petition Dates; and (ii) monthly payments in the amount of $19,001, subject to a full reservation of rights and subject to disgorgement, setoff or other appropriate remedy in the event it is ultimately determined that the asserted FCLSC lien is unenforceable or not validly perfected, and that the payments to FCLSC were not properly paid as lease payments.

41. *Final Hearing.* The Final Hearing is scheduled for December_____, 2025 at _:_ a.m./p.m. (ET) before this Court. The Debtors shall promptly serve copies of this Agreed Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any committee that may be appointed in this Bankruptcy Case, or committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served no later than December _____, 2025 at 5:00 p.m. (ET) upon: (a) the Office of the United States Trustee for the

Eastern District of Michigan; (b) counsel to the Debtors, (i) Stevenson & Bullock, P.L.C., 26100 American Drive, Suite 500, Southfield, Michigan 48034, Attn.: Elliot G. Crowder (ecrowder@sbplclaw.com); and (ii) Robert N. Bassel, P.O. Box T, Clinton, Michigan 49236, (bbassel@gmail.com); (c) counsel to the DIP Lender and the Pre-Petition Lender, (i) Frost Brown Todd LLP, 3300 Great American Tower, 301 East 4th Street, Cincinnati, Ohio 45202, Attn: Ronald E. Gold (rgold@fbtlaw.com); and (ii) Maddin Hauser, One Town Square, 5th Fl., Southfield, Michigan 48076, Attn: Julie Teicher (JTeicher@maddinhauser.com); (d) counsel to Farm Credit Mid-America, Dentons Bingham Greenbaum LLP, 3500 PNC Tower, 101 S. Fifth Street, Louisville, Kentucky 40202, Attn: James R. Irving (james.irving@dentons.com) and Patrick W. Navin (patrick.navin@dentons.com); and (e) counsel to FCLSC, Warner Norcross + Judd LLP, 180 E Water St., Ste. 7000, Kalamazoo, Michigan 49007, Attn: Elisabeth M. Von Eitzen (evoneitzen@wnj.com).

0160484.0803162  4933-4420-6201v3

# **EXHIBIT B**

**LMD Holdings, LLC & Luca Mariano Distillery LLC (Combined)**
Debtor-In-Possession Cash Budget

| | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast --> | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total |
| Week Number --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Start Date --> | 11/8/2025 | 11/15/2025 | 11/22/2025 | 11/29/2025 | 12/6/2025 | 12/13/2025 | 12/20/2025 | 12/27/2025 | 1/3/2026 | 1/10/2026 | 1/17/2026 | 1/24/2026 | 1/31/2026 | 11/8/2025 |
| Week End Date --> | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 2/6/2026 | 2/6/2026 |
| **Cash Receipts** | - | | | | | | | | | | | | | - |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Utilities | - | (450) | (2,500) | - | (525) | (1,000) | (2,500) | - | - | (525) | (3,500) | - | - | (11,000) |
| Insurance | - | (17,302) | - | - | - | (17,302) | - | - | - | (17,302) | - | - | - | (51,906) |
| Rent & Lease | (19,001) | - | - | (19,001) | - | - | - | (19,001) | - | - | - | - | - | (57,002) |
| Taxes | - | - | - | (500) | - | - | (71,298) | (1,500) | - | - | - | (1,500) | - | (74,798) |
| Other Operating Disbursements | - | (6,000) | (1,000) | (6,000) | (1,000) | (6,000) | (1,000) | (6,000) | (1,000) | (6,000) | (1,000) | (6,000) | (1,000) | (42,000) |
| **Total Operating Disbursements** | (19,001) | (23,752) | (3,500) | (25,501) | (1,525) | (24,302) | (74,798) | (26,501) | (1,000) | (23,827) | (4,500) | (7,500) | (1,000) | (236,706) |
| **Operating Cash Flow** | $ (19,001) | $ (23,752) | $ (3,500) | $ (25,501) | $ (1,525) | $ (24,302) | $ (74,798) | $ (26,501) | $ (1,000) | $ (23,827) | $ (4,500) | $ (7,500) | $ (1,000) | $ (236,706) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Secured Debt Payments | - | - | - | (10,691) | - | - | - | (10,691) | - | - | - | (10,691) | - | (32,073) |
| **Total Non Operating Disbursements** | - | - | - | (10,691) | - | - | - | (10,691) | - | - | - | (10,691) | - | (32,073) |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| Loan Fees / Interest | - | - | - | (6,862) | - | - | - | (12,646) | - | - | - | - | (17,251) | (36,758) |
| Professional Fees | - | (90,000) | (40,000) | (43,000) | (40,000) | (36,000) | (36,000) | (38,000) | (40,000) | (40,000) | (40,000) | (37,000) | (35,000) | (515,000) |
| Adequate Protection Payments | - | - | - | (17,711) | - | - | - | (17,711) | - | - | - | - | (17,711) | (53,133) |
| Utility Deposits | - | (10,000) | - | - | - | - | - | - | - | - | - | - | - | (10,000) |
| UST fees | - | - | - | - | - | - | - | (2,433) | - | - | - | - | - | (2,433) |
| **Total Non Operating Disbursements** | - | (100,000) | (40,000) | (67,573) | (40,000) | (36,000) | (36,000) | (70,789) | (40,000) | (40,000) | (40,000) | (37,000) | (69,962) | (617,324) |
| **Net Cash Flow** | $ (19,001) | $ (123,752) | $ (43,500) | $ (103,764) | $ (41,525) | $ (60,302) | $ (110,798) | $ (107,981) | $ (41,000) | $ (63,827) | $ (44,500) | $ (55,191) | $ (70,962) | $ (886,103) |
| **Liquidity Summary** | | | | | | | | | | | | | | |
| Beginning Cash | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 | 2,847 |
| Net Cash Flow | (19,001) | (123,752) | (43,500) | (103,764) | (41,525) | (60,302) | (110,798) | (107,981) | (41,000) | (63,827) | (44,500) | (55,191) | (70,962) | (886,103) |
| DIP Loan Proceeds | 19,001 | 123,752 | 43,500 | 103,764 | 41,525 | 60,302 | 110,798 | 107,981 | 41,000 | 63,827 | 44,500 | 55,191 | 70,962 | 886,103 |
| **Ending Cash** | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 | $ 2,847 |
| **DIP Loan Rollforward** | | | | | | | | | | | | | | |
| Beginning Balance | | 619,001 | 742,753 | 786,253 | 890,017 | 931,542 | 991,844 | 1,102,642 | 1,210,623 | 1,251,623 | 1,315,450 | 1,359,950 | 1,415,141 | |
| Draws | 19,001 | 123,752 | 43,500 | 103,764 | 41,525 | 60,302 | 110,798 | 107,981 | 41,000 | 63,827 | 44,500 | 55,191 | 70,962 | 886,103 |
| Roll-Up | 600,000 | - | - | - | - | - | - | - | - | - | - | - | - | 600,000 |
| **Ending Balance** | $ 619,001 | $ 742,753 | $ 786,253 | $ 890,017 | $ 931,542 | $ 991,844 | $ 1,102,642 | $ 1,210,623 | $ 1,251,623 | $ 1,315,450 | $ 1,359,950 | $ 1,415,141 | $ 1,486,103 | $ 1,486,103 |

**LMD Holdings, LLC & Luca Mariano Distillery LLC (Combined)**
Professional Fees Supplemental Schedule

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast --> | | | | | | | | | | | | | | |
| Week Number --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Start Date --> | 11/8/2025 | 11/15/2025 | 11/22/2025 | 11/29/2025 | 12/6/2025 | 12/13/2025 | 12/20/2025 | 12/27/2025 | 1/3/2026 | 1/10/2026 | 1/17/2026 | 1/24/2026 | 1/31/2026 | 11/8/2025 |
| Week End Date --> | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 2/6/2026 | 2/6/2026 |
| **Professional Fees** | | | | | | | | | | | | | | |
| Stevenson Bullock (LM Distillery Counsel) | - | 45,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 23,000 | 23,000 | 23,000 | 18,000 | 18,000 | 270,000 |
| Bob Bassel (LMD Holdings Counsel) | - | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 26,000 |
| Aurora Management Partners (CRO) | - | 42,000 | 17,000 | 20,000 | 17,000 | 13,000 | 13,000 | 15,000 | 16,000 | 16,000 | 16,000 | 18,000 | 16,000 | 219,000 |
| **Total Professional Fees** | $ - | $ 90,000 | $ 40,000 | $ 43,000 | $ 40,000 | $ 36,000 | $ 36,000 | $ 38,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 37,000 | $ 35,000 | $ 515,000 |